Jay Gustavsen
 gus@davisoncopple.com
Idaho State Bar No. 5293
**DAVISON, COPPLE, COPPLE & COPPLE**
199 N. Capitol Blvd., Ste. 600
Boise, ID 83702
T: (208) 342-3658 | F: (208) 386-9428

Peter K. Stris (*pro hac vice*)
 peter.stris@strismaher.com
Brendan S. Maher (*pro hac vice*)
 brendan.maher@strismaher.com
Rachana A. Pathak (*pro hac vice*)
 radha.pathak@strismaher.com
John Stokes (*pro hac vice*)
 john.stokes@strismaher.com
**STRIS & MAHER LLP**
725 South Figueroa Street, Suite 1830
Los Angeles, CA 90017
T: (213) 995-6800 | F: (213) 261-0299

Attorneys for Plaintiffs STAR DIALYSIS, LLC;
ORDUST DIALYSIS, LLC; ROUTT DIALYSIS,
LLC; PANTHER DIALYSIS, LLC; DAVITA
INC.

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STAR DIALYSIS, LLC; ORDUST DIALYSIS, LLC; ROUTT DIALYSIS, LLC; PANTHER DIALYSIS, LLC; DAVITA INC., <br><br> Plaintiffs, <br><br> v. <br><br> WINCO FOODS EMPLOYEE BENEFIT PLAN; WINCO FOODS, LLC; and WINCO HOLDINGS, INC. <br><br> Defendants. | Case No. 1:18-cv-00482-EJL <br><br> **RESPONSE TO DEFENDANTS' MOTION TO DISMISS [DKT. 20]** |

RESPONSE TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

STATEMENT OF FACTS ............................................................................. 1

LEGAL STANDARD .................................................................................... 4

ARGUMENT ................................................................................................. 4

    I.    DaVita May Pursue A Claim Against WinCo For Violating
        The MSPA ................................................................................. 4

        A.    DaVita has plausibly alleged that WinCo's conduct
              violates the MSPA's substantive prohibitions ............................ 5

        B.    DaVita may seek redress for WinCo's violation either
              via ERISA or via the MSPA's private right of action ............................... 9

            1.    Provisions of an ERISA plan that violate federal law
                 are void .................................................................................. 9

            2.    DaVita also may seek redress for WinCo's MSPA
                 violation via the MSPA's private right of action ......................... 10

    II.    DaVita Has Plausibly Alleged Claims Under ERISA
        Sections 502(a)(1)(B) And (a)(3) .................................................... 14

        A.    DaVita is entitled to pursue relief under ERISA
               Sections 502(a)(1)(B) and (a)(3) on behalf of its patients ...................... 15

            1.    DaVita has obtained valid assignments of all
                 ERISA claims ........................................................................... 15

            2.    The non-assignment clause does not provide a basis
                 to dismiss Counts 2-4 ............................................................... 16

                 a.    The non-assignment clause does not
                      unambiguously bar the assignment
                      of all ERISA claims ........................................................ 17

                 b.    WinCo fails to address the allegations that
                      render the non-assignment clause unenforceable ............. 18

        B.    Count 3 plausibly alleges a claim for benefits because
               the terms of the WinCo Plan do not authorize network
               elimination or Medicare-based reimbursement ........................ 19

         C.    DaVita may seek equitable relief to redress WinCo's failure
               to honestly disclose its network elimination and adoption of
               Medicare-based reimbursement ............................................... 20

RESPONSE TO DEFENDANTS' MOTION TO DISMISS             i

III.    DaVita Has Plausibly Alleged State-Law Claims ................................................. 22

CONCLUSION.......................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Physicians, S.C. v. Connecticut Gen. Life Ins. Company*,
  2017 WL 4868180 (N.D. Tex. Oct. 27, 2017) ........................................................................ 15

*Amara v. CIGNA Corp.*,
  775 F.3d 519 (2d Cir. 2014) ................................................................................................. 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................................. 16

*In re Avandia Mktg.*,
  685 F.3d 353 (3d Cir. 2012) ......................................................................................... 11, 13

*Bakker v. Thunder Spring-Wareham, LLC*,
  108 P.3d 332 (Idaho 2005) ................................................................................................... 23

*Bio-Medical Applications of Tennessee v. Central States Southeast & Southwest
  Areas Health & Welfare Fund*,
  656 F.3d 277 (6th Cir. 2011) ........................................................................................ *passim*

*CIGNA Corp. v. Amara*,
  563 U.S. 421 (2011) ....................................................................................................... 14, 20

*Curtis v. Nev. Bonding Corp.*,
  53 F.3d 1023 (9th Cir. 1995) ............................................................................................... 22

*DB Healthcare, LLC v. Blue Cross Blue Shield of Arizona, Inc.*,
  852 F.3d 868 (9th Cir. 2017) ............................................................................................... 16

*Drzala v. Horizon Blue Cross Blue Shield*,
  2016 WL 2932545 (D.N.J. May 18, 2016) ........................................................................... 16

*Gabriel v. Alaska Elec. Pension Fund*,
  773 F.3d 945 (9th Cir. 2014) ............................................................................................... 22

*Glen Ridge Surgicenter, LLC v. Horizon Blue Cross Blue Shield of N.J., Inc.*,
  No. CIV08-6160 (JAG), 2009 WL 3233427 (D.N.J. Sept. 30, 2009) ................................... 16

*Gregory Surgical Servs., LLC v. Horizon Blue Cross Blue Shield of N.J., Inc.*,
  No. CIV06-0462(JAG), 2007 WL 4570323 (D.N.J. Dec. 26, 2007) ......................... 16, 18, 19

*Grover v. Wadsworth*,
  205 P.3d 1196 (Idaho 2009) ................................................................................................ 23

*Hapeville Dialysis Center, LLC v. City of Atlanta*,
    545 F. App'x 870 (11th Cir. 2013) ............................................................... 9

*Hermann Hosp. v. MEBA Med. & Benefits Plan*,
    959 F.2d 569 (5th Cir. 1992) ............................................................... 17, 18

*Mich. Spine & Brain Surgeons v. State Farm*,
    758 F.3d 787 (6th Cir. 2014) ............................................................... 11

*Misic v. Building Serv. Employees Health & Welfare Tr.*,
    789 F.2d 1374 (9th Cir. 1985) ............................................................... 15

*Moyle v. Liberty Mut. Ret. Ben. Plan*,
    823 F.3d 948 (9th Cir. 2016) ............................................................... 20

*Nat'l Renal Alliance, LLC v. Blue Cross & Blue Shield of Ga., Inc.*,
    598 F. Supp. 2d 1344 (N.D. Ga. 2009) ............................................................... 6, 9

*Parra v. PacifiCare of Ariz.*,
    715 F.3d 1146 (9th Cir. 2013) ............................................................... 11, 13, 14

*Pinnacle Armor, Inc. v. United States*,
    648 F.3d 708 (9th Cir. 2011) ............................................................... 4

*Pride v. Correa*,
    719 F. 3d 1130 (9th Cir. 2013) ............................................................... 4

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963) ............................................................... 21, 22

*Sgro v. Danone Waters of North America*,
    532 F.3d 940 (9th Cir. 2008) ............................................................... 2

*Sidlo v. Kaiser Permanente Ins. Co.*,
    No. 16-00073, 2016 WL 6821787 (D. Haw. Nov. 17, 2016) ............................................................... 18

*Silva v. DiVittorio*,
    658 F.3d 1090 (9th Cir. 2011) ............................................................... 4

*Smith v. Boise Kenworth Sales, Inc.*,
    625 P.2d 417 (Idaho 1981) ............................................................... 22

*Woods v. Empire Health*,
    574 F.3d 92 (2d Cir. 2009) ............................................................... 13

**Statutes**

29 U.S.C. § 1022 ............................................................... 20

29 U.S.C. § 1132(a)(1)(B) ............................................................... *passim*

29 U.S.C. § 1132(a)(3) ........................................................................................ *passim*

29 U.S.C. § 1182 ......................................................................................................... 14

42 U.S.C. 1395c ............................................................................................................ 5

42 U.S.C. § 1395y(b) ......................................................................................... *passim*

**Other Authorities**

29 C.F.R. § 2590.702 ................................................................................................. 14

42 C.F.R. § 411.108 ..................................................................................................... 6

42 C.F.R § 411.161 ...................................................................................................... 6

60 Fed. Reg. 45344-01 (Aug. 31, 1995) ............................................................. 6, 7

CMS Medicare Secondary Payer Manual, Ch. 1 § 30.B ................................ 10, 11, 13

## INTRODUCTION

This lawsuit seeks to vindicate an important federal statute that protects patients with end-stage renal disease ("ESRD"), their medical providers, and the federal fisc. In the Medicare Secondary Payer Act ("MSPA"), Congress barred employer health plans from providing inferior coverage for treatment that is also covered by Medicare. Dialysis for ESRD is one such treatment. Here, Defendants have violated the MSPA by eliminating their provider network and dramatically cutting reimbursement rates for dialysis *alone*—exposing Medicare-eligible ESRD patients to insurmountable financial burdens that others do not face. Defendants protest that they have merely attempted to contain their dialysis costs. But the MSPA's entire purpose is to bar "cost containment" measures that single out Medicare-eligible ESRD patients for worse treatment.

Nor can Defendants use procedural dodges to escape liability. First, federal law provides DaVita a path to redress Defendants' MSPA violation, either under the MSPA's private cause of action or through ERISA. Second, DaVita has standing to sue under ERISA because it holds valid assignments of its patients' claims. Defendants have consistently honored these assignments— even telling *DaVita itself* it had the right to sue under ERISA on behalf of at least one patient. ERISA thus offers a remedy not only for Defendants' MSPA violation, but also their failure to provide benefits according to the plan's terms and to honestly disclose the limits on plan benefits. Finally, because Defendants misled DaVita about what it would be paid, DaVita may pursue relief under state law. Defendants' motion should be denied.

## STATEMENT OF FACTS

DaVita provides life-sustaining care to patients, including WinCo Plan beneficiaries, suffering from ESRD. Complaint, ECF No. 1, ¶¶ 1, 24-26. The WinCo Plan tells beneficiaries that both in-network and out-of-network dialysis treatments are covered. *See* ECF No. 20-3, Hyer Dec.,

RESPONSE TO DEFENDANTS' MOTION TO DISMISS                                      1

Exh. A, WinCo Holdings, Inc. Employee Benefits Plan § 8.1 (hereinafter "Plan").[1] Indeed, the

Plan states that "[t]he final choice of what Providers to see is up to the Participant," *id.* § 11.7, a

choice that will affect their costs: "If you choose a non-contracting Provider you will experience

higher Out-of-Pocket costs," *id.* at p. 25 n.2.[2]

The Plan's benefit schedule informs beneficiaries that "Kidney Dialysis" is covered at

"100% of rate negotiated by contract administrator" for in-network services and at "100% of the

UCR for reasonable claims" for out-of-network services (provided "no negotiated rate is

applicable"). *Id.* at p. 25. The Plan defines UCR, or the "Usual, Customary, and Reasonable" rate,

as the "amount paid for a service in a geographic area based on what Providers in the area charge

for the same or similar medical services." *Id.* at p. 106. Thus, the Plan's unambiguous terms require

WinCo to cover in-network dialysis at 100% of the rate negotiated with the provider and to cover

out-of-network dialysis at 100% of the UCR rate. *See also* Compl. ¶¶ 33-34. In accordance with

these terms, Plan beneficiaries long received in-network coverage for DaVita's services, for which

DaVita was paid negotiated rates. *Id.* ¶¶ 35-39.

Beginning January 1, 2017, however, WinCo adopted a new approach that effectively

eliminated *all* network coverage *only* for dialysis treatment. *Id.* ¶ 43. As of that date, the Plan

required beneficiaries to select providers in the "EthiCare network" for dialysis treatment. *Id.* ¶¶

43-44. This network, however, appears to be non-existent; DaVita is not part of it, nor is DaVita

---

[1] It is ordinarily improper for a court to consider any material outside the pleadings on a Rule 12(b)(6) motion. However, an ERISA plan may be incorporated by reference and properly considered on such a motion. *Sgro v. Danone Waters of North America*, 532 F.3d 940, 942 n.1 (9th Cir. 2008). DaVita does not object to the incorporation by reference of the WinCo Plan. However, incorporation by reference does not permit the Court to make factual determinations, *id.*, and DaVita does not consent to having Defendants' motion treated as one under Rule 56. If Exhibit A of the Hyer Declaration is not incorporated by reference, it should not be considered.

[2] Star Dialysis, LLC, Ordust Dialysis, LLC, Routt Dialysis, LLC, Panther Dialysis, LLC, and DaVita Inc. will be referred to herein collectively as "DaVita." Defendant WinCo Holdings, Inc. is the parent of defendant WinCo Foods, LLC and the sponsor and plan administrator of defendant WinCo Foods Employee Benefit Plan (the "WinCo Plan" or the "Plan"; collectively, "WinCo"). *Id.* ¶¶ 19-22. WinCo Holdings and WinCo Foods are fiduciaries of the WinCo Plan. *Id.* ¶ 22.

aware of any provider who is. *Id.* ¶ 45. Meanwhile Plan beneficiaries requiring other treatments continue to enjoy access to robust provider networks; the Plan eliminated its network for "Dialysis/ESRD" services *only*. Plan §§ 11.9.9(C)(1), 12.10 (carving out only dialysis services).

WinCo's actions place ESRD patients in serious jeopardy. Where a patient receives treatment from an out-of-network provider, the patient now faces financial responsibility for all amounts that the Plan does not pay—*i.e.*, if WinCo reimburses less than DaVita's full billed charges, the patient is responsible for the difference. Compl. ¶¶ 48-50, 57-58. That is why access to in-network treatment is critical: patients face no residual financial responsibility. *Id.* Yet out-of-network providers are now the *only* choice for WinCo's "Dialysis/ESRD" patients. That means those patients, and *only* those patients, face a "choice": stop receiving treatment altogether (and die), or continue receiving treatment and stare down insurmountable medical bills. *Id.*

To make matters still worse for its ESRD patients, WinCo coupled its network elimination with a drastic reduction in reimbursement amounts—pushing patients' residual financial responsibility even higher. As of January 1, 2017, WinCo adopted a Medicare-based reimbursement rate in place of a legitimate UCR rate for non-network dialysis services, in violation of the Plan's own terms. *See* Plan §§ 11.9.9(C)(1), 12.10, p. 106. Just as WinCo eliminated network coverage *only* for dialysis, it applied this new, Medicare-based rate *only* to out-of-network dialysis services. Compl. ¶ 56. The Plan does not define UCR, or any, rates by reference to Medicare. *See* Plan at p. 106 (defining UCR).

Against this backdrop, DaVita has provided life-sustaining care to at least six WinCo beneficiaries, each of whom executed a valid assignment to DaVita. Compl. ¶¶ 60-66. In each case, DaVita followed standard intake and treatment procedures, including contacting WinCo representatives to verify coverage, obtain authorization to provide treatment, and exchange necessary information. Through these interactions, and based on past practice, WinCo led DaVita

to believe it would continue to receive the contracted rate for its services. *Id.* ¶ 60. But beginning in January 2017, WinCo began to pay DaVita at a Medicare-based rate substantially lower than DaVita's contracted rate (which it had received prior to 2017) or DaVita's UCR rate. *Id.* ¶ 60(h).

DaVita appealed WinCo's decisions with respect to the services provided to Patients 1 and 2. In its appeal correspondence, DaVita reiterated that it had obtained assignments from the patients. *Id.* ¶¶ 60(i), 61(i). WinCo denied Patient 1's appeal and told *DaVita itself* it was entitled to sue under ERISA. *Id.* ¶ 60(j). Nonetheless, to avoid litigation, DaVita sent two letters to WinCo and another to EthiCare detailing their unlawful conduct, requesting documents relating to the patients in question, and demanding that they comply with the law. *Id.* ¶ 70. DaVita's efforts were stonewalled, demonstrating the futility of additional attempts at non-judicial resolution on behalf of patients whose plan-based administrative remedies were not already exhausted. *Id.*

## LEGAL STANDARD

To avoid dismissal under Federal Rule of Civil Procedure 12(b)(6), a plaintiff simply must "allege 'sufficient factual matter . . . to state a claim to relief that is plausible on its face.'" *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011) (citation omitted). A court must accept well-pleaded factual allegations as true, construe them in the light most favorable to plaintiffs, and draw all reasonable inferences in favor of plaintiffs. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). A district court should grant leave to amend unless doing so would be futile. *Silva v. DiVittorio*, 658 F.3d 1090, 1105 (9th Cir. 2011).

## ARGUMENT

### I.   DaVita May Pursue A Claim Against WinCo For Violating The MSPA.

This Court's analysis of DaVita's MSPA claim turns on two key questions: <u>first</u>, whether the Complaint plausibly alleges that WinCo violated the MSPA's *substantive* commands, and <u>second</u>, if so, whether DaVita has a *cause of action* through which to seek redress for that violation.

The answer to both questions is yes. First, the MSPA bars not only denying coverage to ESRD patients altogether, but also (1) singling out ESRD patients for inferior benefits, and (2) considering participants' Medicare status in setting benefits. Here, the WinCo Plan does both by eliminating *all* in-network coverage, while simultaneously instituting Medicare-based reimbursement, *only* for "Dialysis/ESRD." Tellingly, WinCo does not even address these core allegations. That is likely because eliminating in-network coverage *only* for "Dialysis/ESRD"—in a manner obviously tied to Medicare—plainly violates the MSPA.

Second, this violation is actionable under both ERISA's prohibition on plan terms that violate federal law and the MSPA's private right of action. Although the Sixth Circuit in *Bio-Medical Applications of Tennessee v. Central States Southeast & Southwest Areas Health & Welfare Fund*, 656 F.3d 277 (6th Cir. 2011), held that the MSPA's private right of action is available only where Medicare itself is "out of pocket," this Court should hold otherwise. The Sixth Circuit's analysis is inconsistent with the statute's text, Ninth Circuit law, and the interpretation of the expert agency tasked with implementing the MSPA. But even if this Court adopts the Sixth Circuit's construction of the MSPA's right of action, a substantive MSPA violation can be remedied via ERISA—regardless of any payment by Medicare (as *Bio-Medical Applications* also held). In short, if WinCo's conduct violates federal law—which eliminating network coverage for ESRD patients surely does—then federal law must offer redress.

**A. DaVita has plausibly alleged that WinCo's conduct violates the MSPA's substantive prohibitions.**

1. Individuals with ESRD are entitled to Medicare regardless of age or other disability. *See* 42 U.S.C. § 1395c. For many years, this led private insurers to push ESRD sufferers onto Medicare—meaning that the federal fisc bore virtually the entire weight of treating ESRD. *See Bio-Medical Applications*, 656 F.3d at 281. Congress enacted the MSPA to invert this status quo, making "private insurers . . . the 'primary' payers and Medicare the 'secondary' payer" during an

individual's first 33 months of ESRD-based Medicare eligibility. *Id.* at 278. "[T]he precise problem that Congress sought to ameliorate was that private plans would provide inferior benefits or coverage for medical treatment that also was covered by Medicare." *Id.* at 281.

The MSPA accomplishes this goal by broadly prohibiting two types of conduct by health plans: (1) "tak[ing] into account" ESRD-based Medicare eligibility and (2) "differentiat[ing]" in the benefits offered to individuals with ESRD as compared to those without. 42 U.S.C. § 1395y(b)(1)(C). Although they overlap, these provisions establish two distinct violations. The "take-into-account" provision principally serves the MSPA's goal of preventing health plans from taking steps to prematurely shift ESRD patients to Medicare, and it bars plans (regardless of how they treat anyone else on the plan) from "consider[ing] the fact that an insured person is also covered by Medicare" in setting benefits. *Bio-Medical Applications*, 656 F.3d at 282. The anti-differentiation provision, on the other hand, carries out the Act's other key aim of preventing discrimination against ESRD individuals. *See Nat'l Renal Alliance, LLC v. Blue Cross & Blue Shield of Ga., Inc.*, 598 F. Supp. 2d 1344, 1352 (N.D. Ga. 2009) (discussing the statute's "non-discrimination" goals in addition to the goal of protecting Medicare's fisc).[3]

---

[3] The regulation governing anti-differentiation claims contains a "like-treatment exception," which says that uniform limitations on dialysis treatment (*i.e.*, limitations that apply equally to ESRD and non-ESRD individuals) "would not be differentiating in the benefits [a plan] provides between plan enrollees who have ESRD and those who do not." 42 C.F.R § 411.161. Thus, although it would not excuse pretextual discrimination against ESRD patients (as DaVita alleges here), this exception may apply to anti-differentiation claims in some circumstances.

The like-treatment exception, however, *never* applies to take-into-account claims—as WinCo appears to concede by failing to cite it or argue it applies to such claims. There are several reasons for this. <u>First</u>, take-into-account claims are governed by a different regulation that does not contain a like-treatment exception. 42 C.F.R. § 411.108; *Bio-Medical Applications*, 656 F.3d at 282 (referring to § 411.108 to determine what constitutes taking into account). <u>Second</u>, as WinCo's motion recognizes, the take-into-account provision bars even facially neutral "[p]lan provisions that have *the effect* of denying, restricting, or terminating benefits for [ESRD-based Medicare eligible] individuals." 60 Fed. Reg. 45344-01, at *45351 (Aug. 31, 1995) (emphasis added); ECF No. 20-1 at 19 (citing same). <u>Third</u>, applying the like-treatment exception to take-into-account claims would allow plans to circumvent the MSPA simply by phrasing their conduct

2. Here, WinCo argues it did not violate these provisions because (1) it did not "*terminate*[] coverage for individuals with ESRD," and (2) the "Plan is not prohibited by law from taking steps to reduce its costs." ECF No. 20-1 at 18-19. That is too narrow a view of what the MSPA bars.

The MSPA prohibits plans not only from terminating coverage, but also from (1) providing materially worse benefits to Medicare-eligible ESRD patients than to others on the plan, and (2) taking Medicare status into consideration in setting benefits. Thus, although the MSPA does not *categorically* "prohibit [plans] from engaging in cost-avoidance practices," 60 Fed. Reg. 45344-01 (Aug. 31, 1995), the entire point of its existence is to bar "cost-avoidance practices" that target Medicare-eligible ESRD patients for inferior coverage. *See Bio-Medical Applications*, 656 F.3d at 281 ("[T]he precise problem that Congress sought to ameliorate was that private plans would provide inferior benefits or coverage for medical treatment that also was covered by Medicare."); 60 Fed. Reg. 45344-01, at *45351 ("Plan provisions that have the effect of denying, *restricting*, or terminating benefits for [ESRD-based Medicare eligible] individuals . . . are prohibited." (emphasis added)).

The WinCo Plan's most obvious violation is eliminating *all in-network coverage* for dialysis alone. Compl. ¶¶ 43-50. That is a remarkable step. Medicare-eligible ESRD patients on the WinCo Plan—unlike patients requiring any other type of treatment—have exactly zero in-network treatment options. Coupled with the Plan's adoption of Medicare-based reimbursement *only* for "Dialysis/ESRD," it can hardly be disputed that the Plan "provide[s] inferior . . . coverage for medical treatment . . . also covered by Medicare." *Bio-Medical Applications*, 656 F.3d at 281. And it is beyond plausible that the Plan impermissibly "consider[ed] the fact that an insured person is also covered by Medicare" because of ESRD in making that decision. *Id.* at 282. The WinCo

---

in ostensibly neutral terms (*e.g.*, "any dialysis patient who becomes eligible for Medicare"). But that is the exact conduct that the MSPA was created to deter.

Plan on its face states that these rules apply to "Dialysis/ESRD" patients. Plan § 12.10. And just as any plan provision concerning long-term, ongoing insulin treatment would obviously target diabetes patients, the Plan's provisions concerning long-term, ongoing *dialysis* treatment are plainly geared toward Medicare-eligible ESRD patients—the only people who need such treatment. *See* Compl. ¶¶ 24-30.

Either of these acts would violate the MSPA standing alone. Together, they take a bad situation for ESRD patients and make it devastating. The Plan's actions mean that Medicare-eligible ESRD patients bear personal financial responsibility for all amounts that the Plan does not pay. Compl. ¶¶ 48-50, 57-58. And because the WinCo Plan simultaneously slashed its dialysis reimbursement rates to Medicare-based levels, those amounts are insurmountable for typical dialysis patients. Compl. ¶ 58. These patients cannot simply stop receiving dialysis. If they do, they will die. Compl. ¶ 25. And although DaVita has rendered an enormous amount of under-compensated care to date, it cannot treat Plan beneficiaries indefinitely without appropriate compensation—nor can any other dialysis provider. Compl. ¶ 58. Put simply, by eliminating all in-network coverage for Medicare-eligible ESRD patients, WinCo has jeopardized the lives and livelihoods of its most vulnerable beneficiaries.

Switching to Medicare—where balance billing is not allowed—is ESRD patients' only refuge from the financial burdens that flow from WinCo's conduct. Compl. ¶ 50. Thus, while WinCo's elimination of in-network coverage surely helps it save money on dialysis treatment, it also plainly induces ESRD sufferers to move to Medicare—"exactly the evil that the Act sought to correct." *Bio-Medical Applications*, 656 F.3d at 282.[4]

---

[4] To the extent the Plan's ESRD patients have not yet left the plan for Medicare, it is likely because (1) the Plan's terms misleadingly suggest they *will* have both in-network coverage and legitimate reimbursement amounts (*see infra* 19-22), and (2) DaVita has not, at least thus far, balance billed Plan participants. But the fact that WinCo tricked its participants into believing they had adequate

3. The complete elimination of in-network coverage, moreover, makes this case crucially different from the two cases upon which WinCo principally relies—*National Renal Alliance*, 598 F. Supp. 2d 1344, and *Hapeville Dialysis Center, LLC v. City of Atlanta*, 545 F. App'x 870 (11th Cir. 2013). Neither case involved allegations that the plan had eliminated all in-network coverage; rather, the plan had reduced payments to out-of-network providers *while still leaving its system of in-network providers in place. See id.* at 872-73; *Nat'l Renal Alliance*, 598 F. Supp. 2d at 1354.

That distinction is all-important. As the court explained in *National Renal Alliance*: "In the end, . . . this [was] a dispute . . . involving in-network and out-of-network service providers. **The person getting the benefit of the dialysis c[ould] still get that service and c[ould] still get that service at a higher reimbursement rate by using an in-network service provider**." *Id.* at 1354-55 (emphasis added). It is an entirely different story where, as here, the plan has eliminated all in-network options for *patients themselves*. WinCo indeed does not even address this issue—it nowhere argues that the MSPA permits complete network elimination—despite it being the core allegation in DaVita's complaint. The reason for this omission is obvious: eliminating all in-network coverage for dialysis and only dialysis violates the MSPA.

### B. DaVita may seek redress for WinCo's violation either via ERISA or via the MSPA's private right of action.

The next question is whether DaVita has a cause of action through which to pursue WinCo's violation of the MSPA's substantive prohibitions. It does.

#### 1. Provisions of an ERISA plan that violate federal law are void.

The first avenue for DaVita's substantive MSPA claim is simple: Under ERISA, no plan provision that violates federal law can be enforced to the detriment of a beneficiary. *See Bio-Medical Applications*, 656 F.3d at 284. Such provisions are void *ab initio*, constitute a breach of

---

coverage, or that DaVita has shouldered the losses rather than itself put ESRD patients in harm's way, cannot insulate WinCo from its illegal plan design.

fiduciary duty, and can be stricken from the plan under 29 U.S.C. § 1132(a)(3) (providing for appropriate equitable relief to remedy violations of ERISA). Moreover, a decision to deny benefits based on a provision that violates federal law is, as a matter of law, arbitrary and capricious under 29 U.S.C. § 1132(a)(1)(B).

The Sixth Circuit in *Bio-Medical Applications* applied this rule in the context of an MSPA violation, holding that "the plan provision terminating coverage [in violation of the MSPA] is void for violating federal law, and [the plan's] decision to deny benefits is arbitrary and capricious for the same reason." 656 F.3d at 284. The same is true here. Accordingly, because DaVita holds valid assignments from WinCo Plan beneficiaries (*see infra* 15-19) it may seek redress for WinCo's MSPA violations via ERISA—regardless of whether Medicare is out of pocket. *See id.*

### 2. DaVita also may seek redress for WinCo's MSPA violation via the MSPA's private right of action.

The MSPA's private right of action provides a second avenue for DaVita to remedy WinCo's substantive violation. The MSPA's private right of action is complicated. And, as WinCo correctly notes, the Sixth Circuit has held it is available only where Medicare has actually stepped in and made a payment that a plan should have made. *Bio-Medical Applications*, 656 F.3d at 287. But DaVita respectfully submits that this Court should draw a different conclusion. The Sixth Circuit incorrectly premised the availability of the MSPA's *private* right of action—which exists to remedy *private* harm—on whether the *government* has suffered *public* harm, even though the statute separately provides a government-only cause of action where Medicare has stepped in.

This Court should hold instead that the MSPA's private right of action permits suit any time, as here, a private plan fails to meet its primary-payer obligations under the MSPA. That conclusion better comports with the plain language of the statute, the Centers for Medicare and Medicaid Services (CMS) MSPA Manual, and Ninth Circuit authority explaining that "[t]he Private Cause of Action applies in the case of a primary plan which fails to provide for primary

payment" as required by the MSPA. *Parra v. PacifiCare of Ariz.*, 715 F.3d 1146, 1154 (9th Cir. 2013) (internal quotation marks omitted).[5]

1. Begin with the text: "There is established a private cause of action for damages . . . in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3).

The first issue is determining when a primary plan fails to make payment in accordance with "paragraph (1)." That much, as *Bio-Medical Applications* put it, "is easy." 656 F.3d at 285. "A primary plan fails to pay under paragraph (1) by, among other things, 'taking into account' that a planholder is entitled to Medicare benefits after being diagnosed with end-stage renal disease." *See id.* at 285 (brackets omitted).

It is the second part—failing to pay "in accordance with paragraph[] . . . (2)(A)"—that is complicated. Paragraph (2)(A) says "[p]ayment under this subchapter may not be made [by Medicare], except as provided in subparagraph [2](B), with respect to any item or service to the extent that . . . payment has been made, or can reasonably be expected to be made . . . as required under paragraph (1)." *Id.* 285-87. Subparagraph (B), in turn, gives the Secretary authority to make "conditional" payment if a plan has not or cannot reasonably be expected to pay promptly. It also requires the plan to repay Medicare if the Secretary makes such a payment and permits the Secretary to file a lawsuit to recover those amounts. *See* 42 U.S.C. § 1395y(b)(2).

In plain English: As a general rule, Medicare may not pay for anything the MSPA requires a primary payer to cover. But if the primary payer fails to pay, the Secretary *may* step in, but does

---

[5] Although DaVita's ability to proceed via ERISA turns on its patient assignments, DaVita may proceed under the MSPA's private right of action in its own right. *See Mich. Spine & Brain Surgeons v. State Farm*, 758 F.3d 787, 790 (6th Cir. 2014) ("Providers of medical care can sue primary plans who fail to pay under the" MSPA.); *In re Avandia Mktg.*, 685 F.3d 353, 367 (3d Cir. 2012); CMS Medicare Secondary Payer Manual, Ch. 1 § 30.B (hereinafter "MSPA Manual") ("claimants" who may sue under the MSPA include a "provider"), www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019017.html.

not have to. When this happens, the plan incurs an obligation to repay Medicare and the federal government is entitled to file suit.

The key question, then, is what the statute means by permitting suit when "a primary plan . . . fails to provide for primary payment . . . in accordance with paragraph[] . . . (2)(A)." *Bio-Medical Applications*, 656 F.3d at 284. The most natural reading, DaVita submits, is that the primary plan fails to pay in accordance with paragraph (2)(A) when it does not provide primary coverage to ESRD patients as required by the MSPA. That is the *only* way the primary plan *itself* could fail to comply with paragraph (2)(A). *See Bio-Medical Applications*, 656 F.3d at 286. The rest of paragraph (2)(A) discusses when *the Secretary* is permitted to make payment. And the cause of action includes no language about what *the Secretary* must do before a private party brings suit.

2. The Sixth Circuit drew a different conclusion in *Bio-Medical Applications*. It held that the best way to reconcile the layers of statutory language was to require that Medicare actually have made a payment where the plan was supposed to have paid. 656 F.3d at 287. That conclusion was mistaken, and this Court should not adopt it.

As the Sixth Circuit itself noted, the only way a primary plan can *itself* fail to comply with paragraph (2)(A) is by failing to make a required payment. The text says nothing about what the Secretary must do before a private party may sue. Indeed, the Secretary's action is optional. And where the Secretary does step in, the statute creates *an independent obligation* for the plan to repay Medicare, and a *separate*, *government-only* cause of action to recover those amounts. 42 U.S.C. § 1395y(b)(2)(B). The *private* right of action should thus be keyed to the *private* parties' conduct.

The Sixth Circuit's contrary view would make sense only if the MSPA's right of action existed to remedy the *government's* injury—for example, if it were a qui tam statute. But as noted, the statute separately accounts for the injury Medicare incurs when the Secretary steps in. And every court of appeals to address the issue has concluded that the MSPA's private right of action

permits private parties to recover solely for their *own* injuries, expressly rejecting the idea that they may proceed based on harm to the government. *See In re Avandia*, 685 F.3d 353, 359 n.9 (3d Cir. 2012) (collecting cases from the First, Second, Sixth, Eighth, and Eleventh Circuits); *Woods v. Empire Health*, 574 F.3d 92, 98 (2d Cir. 2009) ("[T]he MSP[A] allows a private party not to bring suit on behalf of the Government to remedy any wrongs done thereto, but rather to bring suit in the party's own name to remedy the wrong done to it—namely the failure of a primary plan to make the payments required of it on behalf of the private party bringing the suit."). Because the private cause of action vindicates *private* injury—and the statute accounts separately for harm to the government—the Sixth Circuit went astray in making government injury a prerequisite to suit.

That conclusion is also perfectly consistent with the MSPA's purpose of protecting Medicare's fisc. *See Bio-Medical Applications*, 656 F.3d at 281-82. The best way to protect Medicare is to head off misconduct *before* it causes harm to Medicare, not by making Medicare incur the cost in the first instance. Thus, permitting suit based solely on the plan's failure to pay both better accords with the text of the MSPA and better carries out its purpose.

3. Moreover, both CMS and the Ninth Circuit have adopted DaVita's interpretation of the MSPA's private right of action. The CMS MSPA Manual says "any claimant (including a . . . provider . . . ) has the right to take legal action against, and to collect double damages from a [private plan], that fails to pay primary benefits for services covered by the [private plan]." MSPA Manual, Ch. 1 § 30.B. CMS makes no mention of Medicare being out of pocket.

The only on-point Ninth Circuit case likewise adopted DaVita's formulation: "[t]he Private Cause of Action applies 'in the case of a primary plan which fails to provide for primary payment'" as required by the MSPA. *Parra*, 715 F.3d at 1154 (citation omitted). The court in *Parra* did not face the question whether Medicare must be out of pocket, *see id.* at 1153-56, but *Parra*'s straightforward, common-sense reading harmonizes the statute's plain text and the circuits'

RESPONSE TO DEFENDANTS' MOTION TO DISMISS                                      13

unanimous conclusion that the private right of action exists to remedy private, not public, injury. *See id.* at 1154-55. This Court should follow *Parra* and the expert agency tasked with interpreting the MSPA and hold that DaVita may sue under the MSPA's private cause of action.

## II. DaVita Has Plausibly Alleged Claims Under ERISA Sections 502(a)(1)(B) And (a)(3).

Even beyond its MSPA violation, WinCo has violated ERISA in two key ways.

First, the Plan's terms do not authorize the elimination of in-network coverage for dialysis or the payment of Medicare-based reimbursement rates to out-of-network dialysis providers. Yet, as of January 1, 2017, that is exactly what WinCo has done. DaVita, as assignee, accordingly may seek redress under 29 U.S.C. § 1132(a)(1)(B). Compl. ¶¶ 91-95 (Count 3); *infra* § II.B.

Second, not only do plan documents preclude WinCo's conduct, they tell beneficiaries that in-network coverage *will* be available and that out-of-network providers *will* be reimbursed at rates that are higher than Medicare. At a minimum, this constitutes an inadequate disclosure of the actual terms on which dialysis coverage is available. DaVita is thus entitled, under *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), to seek equitable remedies under 29 U.S.C. § 1132(a)(3) for inadequate, false, or misleading disclosures.[6] Compl. ¶¶ 96-102 (Count 4); *infra* § II.C.

Before turning to the substance of these claims, however, DaVita addresses WinCo's incorrect assertion that DaVita lacks "standing." Patients 1 through 6 have validly assigned their (a)(1)(B) and (a)(3) claims to DaVita, and the so-called non-assignment clause does not warrant dismissal on the pleadings of any of DaVita's ERISA claims. *See infra* § II.A.

---

[6] Recovery under (a)(3) is separately warranted because WinCo's conduct violates 29 U.S.C. § 1182. WinCo may ultimately escape liability if it can show that the restrictions on dialysis benefits apply uniformly and are "not directed at individual participants or beneficiaries." 29 C.F.R. § 2590.702(b)(2)(i)(B). However, this is a question of fact that is inappropriate to adjudicate on a 12(b)(6) motion, because it is certainly plausible that WinCo adopted its "cost-containment" program as a result of high dollar claims by one or more of Patients 1 through 6.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS                                          14

**A. DaVita is entitled to pursue relief under ERISA Sections 502(a)(1)(B) and (a)(3) on behalf of its patients.**

**1. DaVita has obtained valid assignments of all ERISA claims.**

It is well-settled that participants and beneficiaries in welfare plans may assign their ERISA claims to medical providers. *Misic v. Building Serv. Employees Health & Welfare Tr.*, 789 F.2d 1374, 1377-78 (9th Cir. 1985) (assignment "results in precisely the benefit the trust is designed to provide and the statute is designed to protect"). Here, in connection with receiving dialysis treatment, each patient executed an assignment of his or her rights to DaVita:

> The Assignment gives DaVita the right to be paid directly for any services rendered to [each patient], and also entitles DaVita to assert [each patient's] legal rights under ERISA and other applicable law. These legal rights include the right to recover benefits, to file claims and appeals, to request and obtain information and documents relating to the plan, and to bring suit for violations of ERISA and other applicable law.

Complaint ¶¶ 60(e), 61(e), 62(e), 63(e), 64(e), and 65(e).

WinCo asserts that "[t]he scope of the assignments are unknown and have not been adequately pled in the Complaint." ECF No. 20-1 at 9. But DaVita is not required to attach or quote from the assignments. Defendants' own authority, *Advanced Physicians, S.C. v. Connecticut Gen. Life Ins. Company*, 2017 WL 4868180 (N.D. Tex. Oct. 27, 2017), held that the plaintiff had plausibly alleged standing for all of its ERISA claims—including under (a)(3)—even though "the assignments . . . are not attached . . . . and are not otherwise presently before the court." *Id.* at *5. Indeed, the plaintiff provided "conflicting descriptions of the exact nature and scope of the assignments," such that the court was "unable to assess the scope of [the] alleged assignments at this juncture," but the court nonetheless found the allegations sufficient to support standing. *Id.* Here, in contrast, DaVita has described each patient's assignment with specificity and consistency.

WinCo appears to accept that the Complaint plausibly alleges the assignment of each patient's benefits claim to DaVita, but it asserts that the assignment does not extend to any other

ERISA claim. ECF No. 20-1 at 9 (arguing that "[t]he assignments should be narrowly construed such that standing does not exist relative to the nonbenefits claims"). Yet the Complaint explicitly describes the broad scope of the assignment. In contrast to *DB Healthcare, LLC v. Blue Cross Blue Shield of Arizona, Inc.*, 852 F.3d 868, 877-78 (9th Cir. 2017), DaVita's assignment does not transfer only the right to payment. Instead, it both "gives DaVita the right to be paid directly for any services rendered," and "*also* entitles DaVita to assert [each patient's] legal rights under ERISA and other applicable law." Compl. ¶¶ 60(e), 61(e), 62(e), 63(e), 64(e), and 65(e) (emphasis added). "These legal rights include the right to recover benefits . . . *and* to bring suit for violations of ERISA and other applicable law." *Id.* (emphasis added). The Court is obligated to accept these allegations as true.[7] The assignments thus cover all of DaVita's ERISA claims.

### 2. The non-assignment clause does not provide a basis to dismiss Counts 2-4.

Only an unambiguous provision in a plan document can bar a valid assignment of ERISA claims. *Drzala v. Horizon Blue Cross Blue Shield*, 2016 WL 2932545, at *4 (D.N.J. May 18, 2016) ("[A] prerequisite to a valid anti-assignment provision is unambiguity."). And even an unambiguous non-assignment clause cannot justify dismissal where the complaint plausibly alleges a basis—*e.g.*, waiver or estoppel—to disregard the non-assignment clause. *Glen Ridge Surgicenter, LLC v. Horizon Blue Cross Blue Shield of N.J., Inc.*, No. CIV08-6160 (JAG), 2009 WL 3233427, at *5 (D.N.J. Sept. 30, 2009); *Gregory Surgical Servs., LLC v. Horizon Blue Cross Blue Shield of N.J., Inc.*, No. CIV06-0462(JAG), 2007 WL 4570323, at *4 (D.N.J. Dec. 26, 2007).

---

[7] WinCo nowhere contends that these allegations are mere legal conclusions to be disregarded, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and if the Court is concerned that the Complaint's allegations with respect to the assignment are deficient for any reason, with respect to any claim, DaVita requests leave to amend its complaint to cure that deficiency by either quoting the entirety of the assignment or attaching it to the amended complaint.

### a. The non-assignment clause does not unambiguously bar assignment of all ERISA claims.

The non-assignment clause in the WinCo Plan does not unambiguously bar the assignment of all ERISA claims to medical providers such as DaVita. At most, it bars assignment of claims that seek "reimbursement under the Plan," *i.e.*, a § 1132(a)(1)(B) claim for recovery of benefits under the terms of the plan. But Counts 2 and 4 seek injunctive and equitable relief under § 1132(a)(3), claims landing outside the scope of the clause.

Second, and more fundamentally, the Fifth Circuit has addressed anti-assignment language functionally identical to the language here and concluded such language does not evidence an intent to bar assignments to medical providers at all; rather, it functions as a spendthrift clause to prevent attachment of benefits by non-provider creditors. *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 959 F.2d 569, 575 (5th Cir. 1992), *overruled on other grounds by Access Mediquip, L.L.C. v. United HealthCare Ins. Co.*, 698 F.3d 229 (5th Cir. 2012). In *Hermann*, the court declined to enforce the following non-assignment clause:

> No employee, dependent or beneficiary shall have the right to assign, alienate, transfer, sell, hypothecate, mortgage, encumber, pledge, commute, or anticipate any benefit payment hereunder, and any such payment shall not be subject to any legal process to levy execution upon or attachment or garnishment proceedings against for the payment of any claims.

*Id.* at 574. The court reasoned that the "typical 'spendthrift' language of the clause [was] clearly intended to prevent either voluntary or involuntary assignment of payments under the Plan to those creditors . . . which have no relationship to the providing of covered benefits." *Id.*

So too here; indeed, the WinCo Plan language is even more clearly targeted at creditors. The first part of the WinCo non-assignment provision, as in *Hermann*, bars assignment of reimbursement rights. *Compare* ECF No. 20-1 at 9 (first clause forbids alienation of "[t]he right . . . to receive any reimbursement under the Plan"), *with Hermann*, 959 F.2d at 574. But the second part of the WinCo non-assignment clause focuses specifically on protecting benefits from

creditors. ECF No. 20-1 at 9 ("and shall not be subject to the rights of creditors, and any attempt to cause such right to be so subjected shall not be recognized"). Thus, there is even more reason here than in *Hermann* to disregard the non-assignment clause. *See also Sidlo v. Kaiser Permanente Ins. Co.*, No. 16-00073, 2016 WL 6821787, at *6-7 (D. Haw. Nov. 17, 2016) (recognizing *Hermann* is consistent with Ninth Circuit law and declining to enforce non-assignment clause).

### b. WinCo fails to address the allegations that render the non-assignment clause unenforceable.

Even if this Court believes that the non-assignment clause applies to claims by medical providers and also unambiguously prohibits assignment of both (a)(1)(B) and (a)(3) claims, dismissal on the pleadings is inappropriate. DaVita has plausibly alleged that WinCo waived and is estopped from relying on the non-assignment clause because, *inter alia*, it specifically told *DaVita itself* it was entitled to file suit. *Gregory Surgical*, 2007 WL 4570323, at *3 ("A party may waive an anti-assignment provision 'by a written instrument, a course of dealing, or even passive conduct, *i.e.*, taking no action to invalidate the assignment vis-a-vis the assignee.'").

WinCo has entirely ignored the factual allegations giving rise to waiver and estoppel. For each of the six patients at issue in the lawsuit, DaVita repeatedly—at least 75 times for each patient—informed WinCo that it was an assignee of the patient.[8] Knowing this, and despite the non-assignment clause, WinCo never objected to the assignment. Instead, it continued to pay DaVita, albeit at an inappropriately low rate. *See, e.g.*, Compl. ¶ 60(h)*. Moreover, DaVita reiterated in appeal letters (written on behalf of Patients 1 and 2) that DaVita had obtained an assignment and was acting as assignee. *Id.* ¶¶ 60(i), 61(i). WinCo still did not object that the

---

[8] For each patient, DaVita submitted standard "UB-04" forms indicating, *inter alia*, that DaVita had obtained an assignment. Each UB-04 typically covered less than one week of treatment, and each patient was treated for at least a year and a half, so DaVita sent a minimum of 75 UB-04s— each one informing WinCo that DaVita was an assignee—for each patient. Compl. ¶¶ 60(f) & (g), 61(f) & (g), 62(f) & (g), 63(f) & (g), 64(f) & (g), and 65(f) & (g).

assignment was barred; to the contrary, it told DaVita *itself* it was entitled to sue under ERISA. *Id.* ¶ 60(j). WinCo thus waived its ability to invoke the anti-assignment language and is now estopped from doing so. *Gregory Surgical*, 2007 WL 4570323, at *4 ("[T]he [Complaint] describes regular interaction between Horizon and GSS prior to and after claim forms are submitted, without mention of Horizon's invocation of the anti-assignment clause."). DaVita is thus entitled to rely on its patient assignments to pursue all of its ERISA claims. At minimum, that question cannot be resolved on the pleadings (and should there be any doubt, DaVita should be permitted to amend the Complaint to allege additional facts pertaining to waiver and estoppel).

### B. Count 3 plausibly alleges a claim for benefits because the terms of the WinCo Plan do not authorize network elimination or Medicare-based reimbursement.

The facts alleged in the Complaint, coupled with DaVita's offer to provide WinCo with specific patient information in a manner that complies with all applicable privacy law, *see* Compl. ¶ 59 n.1, undoubtedly satisfies DaVita's obligation to plead a plausible claim for relief. WinCo conspicuously refrains from saying that DaVita has denied them specific patient information necessary to defend this lawsuit.[9] Nor can WinCo credibly claim ignorance about how benefits were denied in this case. The Complaint explains that WinCo, as of January 1, 2017, began to offer dialysis benefits in a manner that is not authorized by the language of the plan: WinCo eliminated the network of providers promised by the plan, and out-of-network providers were reimbursed at a Medicare-based rate, rather than the legitimate UCR rate described in the plan.

All patients' administrative exhaustion requirements are also satisfied, albeit for different reasons: DaVita alleges it utilized the internal appeals procedure for Patients 1 and 2, Compl. ¶¶ 60(i) & (j), 61(i) & (j), but that the internal review process would have been futile for Patients 3-6. *Id.* ¶¶ 69-70. DaVita must therefore be allowed to proceed with its claim for benefits due under

---

[9] Should the Court have concern about DaVita's failure to include specific patient information in the Complaint, DaVita requests leave to amend and will seek leave to file under seal.

the terms of the Plan. DaVita must also be permitted to proceed with its request for injunctive relief requiring benefits to be provided in the manner specified by the Plan. This injunctive relief (for future benefits) is available under either 29 U.S.C. § 1132(a)(1)(B) or (a)(3).

### C. DaVita may seek equitable relief to redress WinCo's failure to honestly disclose its network elimination and adoption of Medicare-based reimbursement.

As plan fiduciary, WinCo is required to clearly disclose the benefits that are available to participants and beneficiaries. For example, a summary plan description must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). There can be no doubt after *CIGNA* that inadequate, false, or misleading disclosures can be remedied under 29 U.S.C. § 1132(a)(3).[10]

WinCo contends that "[t]he Count Four theories are disguised attempts to obtain compensatory damages, which are not available under ERISA." ECF No. 20-1 at 25. But WinCo ignores controlling Supreme Court authority to the contrary: "[T]he fact that . . . relief takes the form of a money payment does not remove it from the category of traditionally equitable relief." *CIGNA*, 563 U.S. at 441. DaVita seeks the exact remedies the Supreme Court authorized for a fiduciary's faulty disclosures: surcharge, injunctive relief, reformation, and estoppel.

1. WinCo directs most of its arguments to reformation and estoppel, but DaVita may also pursue surcharge and injunctive relief to redress WinCo's inappropriate disclosures. Surcharge is a "form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *CIGNA*, 563 U.S. at 441 (citation omitted). It requires harm and causation, but not detrimental reliance. *Id.* at 444. Under *CIGNA*, inadequate, false, or misleading descriptions of benefits give rise to the surcharge remedy, and that is exactly what

---

[10] WinCo begins with the frivolous argument that Count 4 must be dismissed because DaVita may not assert claims under both § 1132(a)(1)(B) and (a)(3). The Ninth Circuit has rejected this exact argument. *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 959-62 (9th Cir. 2016).

DaVita has alleged here. *See, e.g.*, Compl. ¶ 99. These defective disclosures caused harm to patients by imposing a larger financial obligation on them and to DaVita by under-compensating it for provided care. *See, e.g.*, *id.* ¶ 101(a). WinCo can be surcharged these amounts.

In addition to surcharge, DaVita seeks injunctive relief to remedy WinCo's inadequate disclosures. DaVita's core position is that the MSPA and the Plan prohibit elimination of in-network dialysis coverage and reduced payments to out-of-network providers. But if this Court disagrees, DaVita seeks to have WinCo enjoined from suggesting that in-network coverage exists and that out-of-network providers will be paid a rate that is not pegged to Medicare.

2. Because DaVita may pursue surcharge and injunctive relief, its § 1132(a)(3) claim may proceed even if reformation and estoppel are unavailable. But, in any event, DaVita may pursue those remedies as well. WinCo led its ESRD participants to believe they would have in-network coverage and legitimate UCR reimbursement for out-of-network coverage. As a result, participants obtained treatment in reliance on what WinCo told them, but now face enormous financial burdens because of its misrepresentations. That is a paradigmatic case for reformation and estoppel.

WinCo argues reformation is unavailable because there was no mutual mistake or *intentional* fraud. But "[f]raud has a broader meaning in equity (than at law) and intention to defraud or to misrepresent is not a necessary element." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 193 (1963) (citation omitted). "'[T]he equitable conception of fraud,' . . . generally consists of 'obtaining an undue advantage by means of some act or omission which is unconscientious or a violation of good faith.'" *Amara v. CIGNA Corp.*, 775 F.3d 519, 526 (2d Cir. 2014) (quoting 3 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 873 at 420-21 (5th ed. 1941)). Indeed, "[f]raud . . . in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is

RESPONSE TO DEFENDANTS' MOTION TO DISMISS                                    21

taken." *Capital Gains*, 375 U.S. at 194. WinCo's conduct plausibly falls within this scope.

WinCo's challenge to the estoppel remedy fares no better. It contends that (1) applying estoppel would impermissibly contradict the Plan's terms, and (2) this case does not present the "extraordinary circumstances" necessary to warrant estoppel. Wrong again. First, estoppel would be entirely consistent with the Plan's terms; the Plan facially tells participants they *will* have in-network coverage and *will* be reimbursed at a legitimate UCR rate. Second, the extraordinary circumstances requirement can by met by "evidence that plaintiffs are particularly vulnerable." *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 957 (9th Cir. 2014) (citation omitted). That is absolutely the case for ESRD patients. DaVita has accordingly stated a plausible estoppel claim.

### III.   DaVita Has Plausibly Alleged State-Law Claims.

WinCo tries to ward off DaVita's quantum meruit and promissory estoppel claims[11] by ignoring critical allegations: In the course of the parties' communications about the care DaVita was providing to at least six Plan participants, WinCo led DaVita to believe it would continue to pay for the patients' care properly, either at contracted rates or a legitimate UCR rate. *See* Compl. ¶¶ 60-65(d), 61(d), 62(d), 63(d), 64(d), 65(d), 104. Therefore, DaVita has plausibly alleged promissory estoppel and quantum meruit claims.[12]

Idaho courts apply promissory estoppel to enforce promises "which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which do[] induce such action or forbearance." *Smith v. Boise Kenworth Sales, Inc.*, 625 P.2d 417, 421-22 (Idaho 1981). Here, DaVita plausibly alleges that (1) its "reliance on [WinCo's] promise create[d] a substantial economic detriment, (2) the reliance was or should have been foreseeable, and (3) the

---

[11] DaVita concedes the negligent misrepresentation theory should be dismissed.

[12] To the extent these facts permit recovery under ERISA, DaVita's state law claims are preempted. But if DaVita's recovery is barred under ERISA for any reason, the state-law claims cannot be preempted. *E.g.*, *Curtis v. Nev. Bonding Corp.*, 53 F.3d 1023, 1027 (9th Cir. 1995), *overruled on other grounds by Leeson v. Transam. Disability Income Plan*, 26 F.3d 930 (9th Cir. 2012).

reliance was reasonable and justified." *Grover v. Wadsworth*, 205 P.3d 1196, 1200 (Idaho 2009).

As described above, WinCo led DaVita to believe it would pay for DaVita's services at DaVita's longstanding contracted rates, or at least at a legitimate—*i.e.,* non-Medicare based—UCR rate. DaVita reasonably and justifiably relied on that promise to its substantial economic detriment by providing care for which it was underpaid. Further, based on the parties' course of dealing, WinCo should have foreseen that DaVita would continue serving WinCo beneficiaries with the expectation of appropriate compensation. Any doubt on this score is erased by the Plan's plain language requiring the Plan to maintain in-network coverage (reimbursed at contracted rates) and out-of-network coverage (reimbursed at UCR). Plan at p. 26 (benefits schedule). Accordingly, the promissory estoppel claim survives.

The quantum meruit claim passes muster for similar reasons. As WinCo recognizes, quantum meruit authorizes recovery of the reasonable value of services rendered based on an implied promise to pay. *Bakker v. Thunder Spring-Wareham, LLC*, 108 P.3d 332, 338 (Idaho 2005). As discussed above, DaVita treated at least six WinCo beneficiaries based on WinCo's implied promise to pay in a manner consistent with past practice (and the law). DaVita is therefore entitled to reasonable value for the dialysis services it provided. Here, reasonable value equates to DaVita's UCR rates, or, at a minimum, the contracted rate it received up until January 1, 2017.

WinCo tries to sidestep DaVita's well-pleaded allegations with two misguided arguments. First, its "right to design and amend the Plan," ECF No. 20-1 at 28, is beside the point, because it does not include the right to induce, and then frustrate, DaVita's reliance. Next, WinCo highlights the absence of allegations of *intentional* misrepresentations. *Id.* But this observation also misses the mark, because WinCo's *intent* is not an element of either claim. Accordingly, WinCo's motion should be denied as to the promissory estoppel and quantum meruit claims.

RESPONSE TO DEFENDANTS' MOTION TO DISMISS                                     23

## CONCLUSION

The Court should deny WinCo's motion or, alternatively, grant DaVita leave to amend.

Dated: January 25, 2019

Respectfully submitted,

By: /s/ Brendan S. Maher
    Brendan S. Maher

Peter K. Stris
Brendan S. Maher
Rachana A. Pathak
John Stokes
**STRIS & MAHER LLP**
725 South Figueroa Street, Suite 1830
Los Angeles, CA 90017
T: (213) 995-6800 | F: (213) 261-0299

Jay Gustavsen
**DAVISON, COPPLE, COPPLE & COPPLE**
199 N. Capitol Blvd., Ste. 600
Boise, ID 83702
T: (208) 342-3658 | F: (208) 386-9428

Attorneys for Plaintiffs STAR DIALYSIS, LLC;
ORDUST DIALYSIS, LLC; ROUTT DIALYSIS,
LLC; PANTHER DIALYSIS, LLC; DAVITA INC.