**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| STAR DIALYSIS, LLC; ORDUST DIALYSIS, LLC; ROUTT DIALYSIS, LLC; PANTHER DIALYSIS, LLC; and DAVITA INC., | ) ) ) ) ) |

CASE NO. 1:18-cv-00482-CWD

**MOTION TO DISMISS**

```
STAR DIALYSIS, LLC; ORDUST        )
DIALYSIS, LLC; ROUTT DIALYSIS,    )  CASE NO. 1:18-cv-00482-CWD
LLC; PANTHER DIALYSIS, LLC;       )
and DAVITA INC.,                  )  MOTION TO DISMISS
                                  )
              Plaintiffs,         )
                                  )
       vs.                        )
                                  )
WINCO FOODS EMPLOYEE BENEFIT      )
PLAN; WINCO FOODS, LLC; and       )
WINCO HOLDINGS, INC.,             )
                                  )
              Defendants.         )
_____   )
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE CANDY W. DALE**
**WEDNESDAY, MAY 8, 2019; 2:34 P.M.**
**BOISE, IDAHO**

Proceedings recorded by digital audio recording, transcript produced by transcription.

**TAMARA I. HOHENLEITNER, CSR 619, CRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO  83724

**FOR PLAINTIFFS**
        John Stokes
        STRIS & MAHER LLP
        725 S. Figueroa St., Ste. 1830
        Los Angeles, CA 90017

        Michael N. Donofrio
        STRIS & MAHER
        28 Elm Street, 2nd Floor
        Montpelier, VT 05602

        Jay M. Gustavsen
        DAVISON COPPLE COPPLE & COPPLE
        PO Box 1583
        Boise, ID 83701

**FOR DEFENDANTS**
        Tyler J. Anderson
        HAWLEY TROXELL ENNIS & HAWLEY LLP
        PO Box 1617
        Boise, ID 83701-161

        John Christopher Hughes
        THE ERISA LAW GROUP, P.A.
        205 North 10th Street
        Boise, ID 83702

1                          I N D E X

2                        MAY 8, 2019

3
  **Date      Proceeding                                    Page**
4

5  **5/8/19    Motion to Dismiss**
            Argument by Mr. Anderson........................  5
6           Argument by Mr. Stokes.......................... 26
            Argument by Mr. Anderson........................ 51
7           Court takes under advisement.................... 54

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

May 8, 2019

1  THE CLERK:  The court will now hear argument in
2  Case No. CIV-18-482-S-CWD, Star Dialysis, LLC, et al., versus
3  WinCo Foods Employee Benefit Plan, et al.
4
5
6  Counsel, please state your appearances for the record
7  beginning with the plaintiff.
8  MR. STOKES:  Good afternoon, Your Honor.
9  John Stokes, along with my colleague, Mike Donofrio,
10 from Stris & Maher for the plaintiffs.  With us here are Andrew
11 Kelly, an assistant general counsel at DaVita, and our local
12 counsel, Jay Gustavsen.
13 I just wanted to note for the court that Mr. Kelly is
14 on the last flight out of Boise back to Denver today, and so
15 there is some small possibility that he may have to excuse
16 himself.
17 MR. KELLY:  (Inaudible), Your Honor.
18 THE COURT:  Okay.  So if I see him leaving it's not
19 something I said.
20 (Laughter.)
21 THE COURT:  Okay.
22 MR. ANDERSON:  Good afternoon, Your Honor.  Tyler
23 Anderson, Hawley Troxell, for the defendants, WinCo.
24 MR. HUGHES:  John Hughes, Hawley Troxell, for the
25 defendants.

1           THE COURT:  Well, good afternoon.  And I understand

2      the plaintiffs' group did receive the information that I was

3      trying to limit the time of argument for both sides to 45

4      minutes.  So that means, Mr. Anderson, that you can reserve a

5      portion of the 45 minutes, but I'll restrict your opening and

6      your reply comments or rebuttal to a total of 45 minutes.

7           MR. ANDERSON:  Thank you, Your Honor.

8           THE COURT:  I apologize if that information didn't

9      get to you, but it did get to the plaintiffs' group.  And I

10     believe, Mr. Stokes, you were also asking to divide the argument

11     between --

12          MR. STOKES:  Yes, Your Honor.

13          THE COURT:  -- or among two of you.

14          MR. STOKES:  With the court's permission, I will be

15     addressing the MSPA issues and my colleague, Mr. Donofrio, will

16     address the ERISA and remaining issues.

17          THE COURT:  Okay.  Great.

18          Well, this is the motion to dismiss filed by the

19     defendants.  And I have reviewed the briefing, the applicable

20     law, and prepared to hear your arguments.  It is docket 20 on

21     the record.

22          And so I'll turn it to Mr. Anderson to proceed first.

23          MR. ANDERSON:  Thank you, Your Honor.

24          Your Honor, I would like to reserve ten minutes.  I

25     don't know that I'll need the full time.  I thought we might get

1    an hour so I have kind of planned for 30 minutes per side so

2    this is kind of a little bit of a luxury, but I'll get to what I

3    need to get at.

4         THE COURT:  Okay.  Great.

5         MR. ANDERSON:  Thank you.

6         So in some form or fashion today, Your Honor, I intend

7    to touch on all of the counts, but for purposes of today, I want

8    to talk about standing in the assignment.  I also want to talk

9    about Count 1 in the MSPA claim, Medicare Secondary Payer Act.

10   I'll shorthand that to MSPA; and then Count 3 the failure to

11   state a claim for benefits under ERISA.

12        So just for some background here, of course, the

13   purposes of this motion, the plaintiffs are -- in this motion

14   only, the plaintiffs are relieved from proving the allegations

15   in the complaint.  Taking those as true, the plaintiffs

16   compromise a group of medical providers that give kidney

17   dialysis services.  They have alleged in their complaint in

18   paragraph 28 dialysis expense.  That's why we're here.

19        Paragraph 28 states that in 2013, it was a $42 billion

20   industry.

21        Paragraph 9 says that dialysis is special because it's

22   expensive.

23        So the essence of this lawsuit stems from the

24   plaintiffs' backlash against WinCo in response to WinCo's

25   efforts to protect itself from its participants from a

1    staggering and growing cost of dialysis in this billion-dollar

2    industry.

3              So I kind of look at the complaint as

4    pre2017/post2017, because according to the complaint, everything

5    changed on January 1, 2017.  And I say that because in paragraph

6    35, they allege that prior to December 31, 2016, Blue Cross was

7    the third-party claims administrator.  And up to that point,

8    Blue Cross of Idaho processed claims for treatment rendered by

9    the plaintiffs to WinCo plan beneficiaries.  But in 2017 that

10   changed, and the change that they are focusing on is WinCo's

11   decision to replace Blue Cross of Idaho with EthiCare.

12             THE COURT:  Was Blue Cross replaced for all medical

13   treatment issues by EthiCare or only the dialysis treatment?

14             MR. ANDERSON:  For dialysis only, Your Honor.

15             There is a key allegation in the complaint.  It's at

16   paragraph 53.  And that key allegation is even with that

17   replacement, since January 1, 2017, the WinCo plan has paid for

18   the treatment.  The reason we're here today is we're talking

19   about the amount of reimbursement.

20             But I want to make clear right up front that we're not

21   talking about an allegation of nonpayment.  We're not talking

22   about an allegation that Medicare has been made to come in here

23   and pay anything either.  We have --

24             THE COURT:  Isn't that a potentially fatal fact on the

25   MSPA?

1          MR. ANDERSON:  In my view, Your Honor, and the cases

2     we cited, it's absolutely a fatal fact.  In fact, I would call

3     it the key to the courthouse, as it relates to the MSPA.  And I

4     will certainly touch on the provisions regarding differentiation

5     and taking into consideration.  That's one piece of it, but it's

6     a two-step analysis.  You not only have to have those elements,

7     taking into consideration or differentiation; every case that's

8     looked at says that you have to have Medicare come out of pocket

9     and pay somebody.  And I'll go into further detail about why

10    that is.

11         So we have -- we have six patients who have alleged

12    treatment.  And the central complaint, as I started, is that

13    we're talking about the rate of reimbursement after December 31,

14    2016.  And we provided a notice of supplemental authority.

15    There was a companion case filed in the Northern District of

16    California against a defendant called *Amy's Kitchen*, and we

17    submitted the court's decision and order granting the motion to

18    dismiss and for background.  The complaint that was filed in

19    that case, we wanted to give the court some flavor that the five

20    causes of action alleged in the Northern District in the *Amy's*

21    *Kitchen* case are the same five causes of action.  And this is

22    the one time, maybe, that the word allegations are virtually

23    identical may even apply here as you look at and compare what's

24    really alleged.

25         In the *Amy's Kitchen* case and the dismissal turned on

two points that apply here:  One is a lack of standing; and,
two, is a lack of an injury, because there was not an allegation
that benefits were denied, rather, as those benefits were
defined in the plan.

So starting with standing, I don't think there is any
argument that plaintiffs have standing in their own right to
bring claims under ERISA.  That was brought up in the *Amy's
Kitchen* case.  It's referenced in the decision at page 6.  The
plaintiffs really didn't dispute it there, and they don't really
dispute it here.

So the key to standing is the plaintiffs must have
what's referred to as "derivative standing" to get to -- the
court to enforce the civil enforcement provisions of ERISA.  And
unless they have derivative standing, they can't bring the
claims on behalf of the participants.  And how do you get
derivative standing?  The *Spindedex* case and the *DB Healthcare*
cases that we have cited to the court, you get an assignment.

THE COURT:  Now, this is true with regard to the ERISA
claims.  Is it also, you believe, an accurate statement of law
with regard to the MSPA?

MR. ANDERSON:  You know, Your Honor, we are not taking
that position.  The MSPA allows for a private cause of action if
the elements are met, as I referred to earlier, taking into
consideration or differentiating, plus bad conduct requiring
Medicare to do something, pay somebody.  But we're not taking

1    the position that for purposes of ERISA the assignment comes

2    into play right now.

3            And, frankly, the reason for that, Your Honor, is

4    twofold.  The assignments are not in front of this court.  The

5    only thing that's in this court as it relates to the record is

6    the characterization of those assignments and argument in

7    briefing about those assignments.  So the assignments may be for

8    another day, but that's my best answer to your question as it

9    relates to our arguments here regarding ERISA.

10           So --

11           THE COURT:  So are you saying the -- the questions

12   regarding the assignment and whether it was valid or provided

13   derivative standing that that's not relevant to your motion to

14   dismiss the ERISA claims?

15           MR. ANDERSON:  That's absolutely relevant in this way.

16   The ERISA claims as we view them are Counts 2, 3, and 4.

17           THE COURT:  Right.

18           MR. ANDERSON:  And we have an antiassignment provision

19   in our plan that would address Counts 2, 3, and 4.

20           The point I was making earlier is what's not in the

21   record before the court is the scope of the assignment.  For

22   example, is it benefits only?  Is it causes of action for

23   fiduciary duty?  Is it cause -- I mean, what is it?  And so

24   since that's not in front of the court, I don't intend to argue

25   that today.

1          So there is an allegation, as I just referred to, in

2     the characterization of the assignment that the patients gave to

3     the plaintiffs.  So there is two pieces to this puzzle:  One is

4     the validity of the assignments and two was the scope.  And as I

5     have mentioned, the scope is not necessarily in front of the

6     court, because the actual assignments are not in front of the

7     court.  We're taking the allegations on their face.

8          So just focusing on the validity piece, when a plan

9     contains a provision that precludes an assignment, an

10     antiassignment clause, no valid assignment can be completed.

11          And the WinCo plan does exactly that, Your Honor.  You

12     have got it in front of you, Your Honor.  It's in the record

13     under the Hyer declaration at docket 20.  This is page 74.  This

14     is the provision that we're talking about.  The *Spindedex* and

15     *Davidowitz* cases in the Ninth Circuit hold that antiassignment

16     clauses under ERISA plans are valid and enforceable.

17          And so when you look at this, that's exactly what it

18     is, a nonassignability of rights.  The language is clear.  You

19     have got to start with the first sentence:  "The right of any

20     participant to receive any reimbursement under the plan shall

21     not be alienable by the participant by assignment or any other

22     method."  And then there is a comment that has another clause

23     that I will get to.

24          The language is clear, and that's why our position is

25     this language precludes Counts 2, 3, and 4.

1          So the response to this argument that we got was,

2     first, that there was an attempt to invalidate the

3     antiassignment provision because: The argument No. 1, it's

4     ambiguous; argument No. 2 is that WinCo by its conduct before

5     the suit was filed waived or is somehow estopped from asserting

6     the antiassignment provision.

7          And I noticed in the briefing -- the authority in the

8     briefing with the exception of one case from the District of

9     Hawaii is not from the Ninth Circuit.  There is a trio of cases

10    from the District of New Jersey, and there is a case from the

11    Fifth Circuit called the *Herman* case.

12         So let's talk about ambiguity.  The argument here is

13    that there is an ambiguity.  It's based on the *Herman* case,

14    which is a 1992 case where in that case, the court found that

15    the antiassignment provision was focused only on creditors.  And

16    since it was only focused solely on creditors, it couldn't be

17    extended to anybody else.

18         But ten years later in 2002, the Fifth Circuit

19    clarified the *Herman* decision in a case called *Letourneau* which

20    is 298 F.3d 348.  *Letourneau* said a few important things in the

21    Fifth Circuit that the reason the antiassignment clause in

22    *Herman* was not enforced is because it was focused solely on

23    creditors and on un- -- excuse me -- who might attempt to obtain

24    voluntary assignments to cover debts having no nexus with the

25    plan or its benefits.

1          But to be clear, at the end of the *Letourneau* case,

2    *Letourneau* stated that *Herman* does not stand for the proposition

3    that all antiassignment clauses are per se invalid vis-a-vis

4    providers of healthcare.

5          Basically, what those cases teach is you look at the

6    language.  And so if I were in the Fifth Circuit, Your Honor, I

7    would be making these same arguments because we need to be

8    looking at the language.

9          And, of course, the argument here that was in the

10   briefing is that this nonassignability of rights provision on

11   the screen is focused only on creditors.  That's not true.

12         And the court, of course, knows that in construing the

13   language, it has to be a reasonable construction that gives

14   meaning to all of the language.

15         And so the plan, right from the start as I mentioned,

16   the first sentence makes a broad, categorical statement that

17   assignments are not allowed.  And from that foundation, it

18   builds with a very important conjunctive "and" after the comma.

19   "And shall not be subject to the rights of creditors."

20         So then the clause goes on to talk about whether

21   that's a voluntary assignment or an involuntary assignment.

22         So I would -- I would submit that the second clause

23   "and shall not be the subject to the rights of creditors" is

24   more akin to the spendthrift-type provision that was in *Herman*.

25   But that's not all the provision says.  The provision is much

1    broader than that, which is why I say, even if we were in the

2    Fifth Circuit, I would still be arguing that the court has to

3    give meaning to all of the language and to focus only on the

4    creditor portion, reads out of existence entire portions of that

5    provision; and therefore, the court under the interpretation

6    adopted by the plaintiffs could not give meaning to that

7    language, and that's why it's not a reasonable interpretation to

8    advance before this court.

9            THE COURT:  Well, I thought the plaintiffs' argument

10   is that the fact that Blue Cross went ahead and processed some

11   of these claims that resulted in payments to the -- or denial of

12   payments to the reimbursement to the six patients, that that was

13   what constituted the waiver.

14           MR. ANDERSON:  That is exactly right, Your Honor,

15   because as I mentioned, they are arguing ambiguity of the

16   language itself, and they are also arguing a waiver or an

17   estoppel.  And so this piece goes to whether the words on the

18   page are ambiguous.  And I will get right to -- yet, you're

19   exactly right, Your Honor.

20           The argument here on waiver and estoppel is that there

21   was somehow a waiver presuit or an estoppel presuit.  Of course,

22   we're here focused on the pleading.  Waiver is an intentional

23   relinquishment of a known right that's not pled.  Estoppel is

24   not pled here.

25           But let me address the specific arguments that

1    Your Honor raised.

2        There was a waiver because the plan paid money.  Well,

3    that's what plans do according to its terms.  What else -- what

4    other choice would the plan have?  There is an argument that

5    there is a waiver here because DaVita was treated as an

6    authorized representative, and somehow the defendants are waived

7    or have an estoppel against asserting the antiassignment

8    provision because they were treated; the plaintiffs were treated

9    as authorized representatives.  Well, dealing with an authorized

10   representative instead of a patient is not only permitted under

11   ERISA, it's required.  It's in 29 C.F.R. Section

12   2560.503-1(b)(4).  I feel like I'm in bankruptcy court,

13   Your Honor.

14       THE COURT:  Yeah.  Well, you don't have a bankruptcy

15   judge to spout those types of numbers back at you, so you're

16   safe.

17       MR. ANDERSON:  I'll keep it to myself.  Thank you,

18   Your Honor.

19       So -- so to say that the plan dealt with DaVita as an

20   authorized representative and paid money isn't a waiver.  It's

21   compliance with what happens under ERISA.  A plan is allowed to

22   deal directly with a provider.

23       The other argument is that there is a waiver or an

24   estoppel.  This is what the argument is:  Because the plan

25   advised plaintiffs or the patients of a right to sue and then

1    later took the position and asserted the antiassignment

2    provision.  Well, let's break that down.

3         First of all, Your Honor, in getting ready for this

4    hearing, there are two District of California in the Central

5    District and Northern District cases from 2019 that speak to

6    those issues.  I would like to at least offer the cites to the

7    court because they are right on the money.

8         The first is *California Spine vs. Blue Cross*.  It can

9    be found at 358 F Supp 3d 949.  It's a Northern District of

10   California case from January 7th of 2019.  The other case is the

11   *California Surgical Institute vs. Aetna*, and it's a Westlaw

12   cite.  It's 2019 Westlaw 158145 from the Central District of

13   California, February 6, 2019.

14        Both of those cases stand for the proposition that the

15   assertion of an antiassignment clause is a matter that belongs

16   in litigation.  It doesn't belong in the claims-handling

17   process.  Because it's a defense to standing.  And the court can

18   certainly look at those cases, but they are parallel to the

19   facts that are presented here.  And so advising of the right to

20   suit and then having a suit follow and later asserting that the

21   antiassignment clause bars the suit is exactly what these cases

22   speak to.

23        And, in fact, there is a citation to a Ninth Circuit

24   case that's in an appendix, *Brand Tarzana*, but the California

25   Surgical Institute states that:  The Ninth Circuit has indicated

1    that an antiassignment provision need not be asserted as a

2    defense during the administrative process.

3           And the other point to be made here, Your Honor, is

4    it's a requirement of law to advise of the right to file suit.

5    And so how could it be that a requirement of law means a waiver

6    of defenses in litigation later?  It just -- it just doesn't

7    hold together.

8           So from our perspective, Your Honor, the

9    antiassignment provision is not ambiguous.  The interpretation

10   that's been advanced is not a reasonable one because it doesn't

11   give consideration to all of the language.  The waiver arguments

12   are blunted by law.  Antiassignment clauses can be asserted in

13   litigation as a defense, particularly on standing.  And it just

14   makes sense.  Standing has a statutory dimension.  It has a

15   constitutional dimension.  And so it's simply -- those cases

16   share the point that it is something that doesn't belong in the

17   claims handling process.  And in particular, even if the plan

18   knew about the clause itself -- and that's in the *California*

19   *Spine vs. Blue Cross* case where the court rejected the attempt

20   to read the *Spindedex* case any broader than what it says.

21          So that's our position on the antiassignment provision

22   and standing.  Our view is that the antiassignment provision is

23   a state of bars, Counts 2, 3, and 4, the ERISA counts.

24          And so now I want to get to Counts 1 under the MSPA.

25   So for background, that's just sort of the standing as it

1      relates to the claims.  Now I want to talk about the Count 1 in

2      particular.

3              And I don't know that this needs to be made as

4      difficult as the briefing suggests.  I mean, we have stated the

5      history of the MSPA to the court.  It goes back to 1980.  It was

6      an effort to make private insurers primary and Medicare

7      secondary, as the act suggests.  There is no surprises there.

8      The MSPA prevents at least two things which I have alluded to,

9      the taking into consideration provision and the differentiation

10     provision.  An example of taking into consideration would be

11     terminating a person from a plan because they have ESRD, kind

12     of -- if the court could look at it as an individual-based

13     treatment.  If you have ESRD, you are off of plan.

14             An example of differentiation is charging people

15     higher premiums because they have ESRD, kind of a class of folks

16     treating them differently.  And I'm going to get to the

17     regulations that say so long as the plan makes changes that

18     apply equally across the board, that doesn't violate the MSPA.

19             But there is another important point to be made before

20     we even get there, which is the point Your Honor raised right at

21     the outset of this, which is what I call the key to the

22     courthouse.  To get to a private cause of action under the MSPA,

23     there is a critical factor missing from the allegations in this

24     case.  Medicare has not been implicated.  And what cuts through

25     all of this is that Medicare hasn't paid a dime.

1       We have cited case after case after case in the

2   briefing, the *Bio-Med of Tennessee* case is the lead case cited

3   in the complaint that says clear as a bell -- and I'll read to

4   the court a citation to it.  But we have got *National Renal*

5   *Alliance*, the *Bio-Med of Georgia v. Dalton*, and all of the other

6   three or four cases we have cited in footnote 2 of our briefing

7   on pages 9 and 10, that any court to take a look at it has said

8   you have to have Medicare make the payment.  And I have yet to

9   see the plaintiffs come forward and yet to read a case that says

10  otherwise.

11      What the plaintiffs now do is, it's an about face.

12  They say, we suggest the court reach a different conclusion.

13  The Sixth Circuit *Bio-Med of Tennessee* case is the best case

14  going at the time of the filing of the complaint.  We filed this

15  motion to dismiss, and immediately they asked for a different

16  conclusion.

17      THE COURT:  Is there any Ninth Circuit authority at

18  this point?

19      MR. ANDERSON:  Not to my knowledge, Your Honor.

20      THE COURT:  So that's not totally unheard of that

21  counsel would ask a court within a different circuit to take a

22  different approach?

23      MR. ANDERSON:  Not unheard of, but I guess to make the

24  point, it would be -- it would be the first decision that at

25  least I have seen out there.  And I'll note for the record,

1    Your Honor, the plaintiffs in *Amy's* -- excuse me -- the

2    defendants in *Amy's Kitchen* made this same argument; and because

3    the court reached the decision on other grounds, it did not

4    treat it in the order.  I had the privilege of reading the

5    transcript, and there was quite a dialogue about it, but

6    that's -- that's what I can say about that, Your Honor.

7         So against the background of the cases that I have

8    just referred to, let's just look at the *Bio-Med of Tennessee*

9    case; that's the Sixth Circuit case.  A plan becomes liable

10   under the MSPA private action provision, quote, when it

11   discriminates against plan holders on the basis of their

12   Medicare eligibility -- here is the important part -- and

13   therefore causes Medicare to step in and foot the bill.  It's

14   the "and."  It's the "and" that makes the complaint deficient.

15        THE COURT:  But isn't -- couldn't we construe the

16   plaintiffs' argument and their complaint that they filed this

17   lawsuit so that, in fact, does not happen?  In other words, that

18   it's WinCo and EthiCare Advisors -- it's -- it's the inevitable

19   outcome of the new contract between WinCo -- the WinCo plan and

20   EthiCare Advisors, that it will lead to certain of the

21   beneficiaries under the plan that are Medicare eligible to get

22   their dialysis paid by Medicare rather than WinCo.

23        MR. ANDERSON:  And that's a fair question, Your Honor.

24        My best answer to that question is that still does not

25   mean there is at present a concrete injury in fact.  The idea

1    that it might lead to it or it may not lead to it, whether they

2    get balance billed for the -- all of that is not in front of the

3    court right now.  What the cases suggest is that Medicare has to

4    step in and foot the bill.  And I think that's what the *Amy's*

5    *Kitchen* case drives home, which is the injury in fact, which

6    comes into play when we talk about Count 3.

7           But at this point, there is no allegation that

8    Medicare has been made to step in and pay anything.  In fact,

9    the opposite is true.  There is affirmative allegations that the

10   plan has paid claims for reimbursement, all of them.  As I

11   started at the outset, there is not an allegation that somehow a

12   claim went unpaid.

13          So Medicare hasn't been impacted and the public fisc,

14   to use the phrase from the Sixth Circuit, has not suffered.  And

15   just as the title suggests, Medicare as a second payer, Medicare

16   has not paid anything.  We are not there yet.

17          And so -- that's step one in my view.  We have to have

18   Medicare suffer some sort of payment and injury to the public

19   fisc which, goes all the way back to 1980 and the reasons for

20   the act itself.

21          But then, let's break down taking into account or the

22   differentiation.  There is no allegation here that the plan

23   terminated coverage for participant because of Medicare

24   eligibility.  Terminated.  That's in the Sixth Circuit case,

25   too.  That's an example.  There is no allegation that the plan

1   made a decision by taking into consideration an individual

2   receiving beneficiaries because that person had end-stage renal

3   disease, ESRD.  There is no allegation of offering less

4   competitive -- comprehensive benefits rather to an ESRD person.

5   There is no allegation that the plan limits other available

6   coverages to a person with ESRD.  There is no allegation that

7   ESRD patients have to pay higher premiums.  There is no

8   allegation that the plan discriminated such that Medicare came

9   in and paid anything, or that Medicare made a conditional

10  payment.

11          And so in addition to what's not alleged here is the

12  plan isn't handcuffed.  It's not prohibited from limiting

13  coverage for a particular service so long as the limitation

14  applies uniformly to all plan enrollees.  And we cited the

15  regulation.  It's 42 CFR 411.16(c).  I said I wouldn't do it

16  again, and I did.  And we also cited to the comments to the

17  MSPA:  A plan in short is not obligated to cover all types of

18  medical treatment or services so long as the limitation applies

19  to everyone equally.

20          So before I move on to Count 3, I want to talk about

21  how this argument on Count 1 impacts Count 2.  As I read

22  Count 2, they are arguing that Count 2 is an assertion of a

23  claim because the plan violates federal law.  And the violation

24  of federal law that's claimed is under the MSPA.  And it's a

25  long way of saying, Your Honor, if the court finds that the MSPA

1    claim fails to state a claim that is invalid, then Count 2 has

2    to go with it because that's the basis for the count.

3         So Count 3.  Count 3 is failure to state a claim for

4    denial of benefits.  And this is where *Amy's Kitchen* comes back

5    in.  The benefit cause of action in that case was Count 3 as

6    well.  The court did an analysis of the plan itself and -- to

7    test in *Amy's Kitchen* whether there was an adverse benefit

8    determination, and the court reached the conclusion that there

9    was not because DaVita was paid what was called for in the plan.

10        And the parallel here is, absolutely.  Not only -- we

11   could skip that entire analysis.  There is not even an

12   allegation of a denial of benefits or an allegation of a plan

13   term that was violated.  So we're talking about a claim for

14   benefits here.

15        And as I looked at the transcript, Judge Tigar started

16   right out of the gate asking questions that certainly might be

17   on this court's mind, to counsel for the plaintiffs:  Wasn't

18   your assignor paid all the benefits to which they were entitled?

19   That's what the complaint says here.  That's what the complaint

20   said there.  What are the benefits to which the assignor was

21   entitled under the plan that the person didn't get?  That's

22   what's just all over the case as far as the complaint goes.

23        So that's what led the court in *Amy's Kitchen* to find

24   there was no injury in fact.  And that's exactly what's going on

25   here.  If you carefully look -- I know the court has it.  If you

1    just take 92 through 95 paragraphs of the complaint, there is no

2    allegation that benefits were denied; and that just jumps off

3    the page to me when we're talking about a claim for benefits.

4         And, you know, just kind of making it more simple,

5    there is none of the basics of a benefits claim, an allegation

6    that, you promised me these benefits and you didn't give them to

7    me, you broke your promise.  There is -- in addition to a lack

8    of an allegation that benefits were denied, as I mentioned,

9    there is several affirmative allegations that benefits were

10   paid.

11        And another important point.  I have said now for a

12   third time that this is not a case about nonpayment, but this

13   isn't a case about a short payment.  There is no allegation or

14   articulation of how what was paid falls short of what was

15   promised in the plan.  It's not an attack on the language of the

16   plan.  And so that's why when we look at Count 3, it's -- it's

17   subject to dismissal.  There is no identification of an

18   individual plan term that was violated.

19        And the other piece -- and I know that it's not a high

20   bar in federal court to allege a complaint in the claim for

21   relief, but there is a bar.  And, you know, without getting into

22   *Iqbal* and *Twombly* and the cases that we have all heard about,

23   there is no allegation when we have six patients of the type of,

24   who, what, when, where allegations to state a claim.  And, of

25   course, *Twombly* says you can't paint the defendants with the

25

 1     same brush, so the same has to be true with respect to the

 2     plaintiffs.  We are entitled to know, if there is a benefits

 3     claim to be made here, what's going on with respect to these six

 4     patients.  We don't know if it's -- at least its alleged in the

 5     complaint -- are talking about six treatments?  Are we talking

 6     about ten times six treatments?  A hundred times six treatments?

 7                 And why is that important?  Well, it goes to another

 8     factor which is, where is this treatment given?  Because that

 9     drives the usual and customary reasonable charges analysis.

10                 So the factual detail is missing in that regard, and

11     all we have to work with is paragraphs 92 through 95.

12                 I'm just going to shortly conclude, Your Honor.

13                 Count 4 is a claim for all kinds of various equitable

14     relief, including surcharge, reformation, and estoppel.

15     Certainly, there are authorities out there that say that type of

16     relief may be available.  I'm not here to challenge that, but

17     the facts alleged don't support it, and I'm just going to leave

18     it to the briefing on that point.

19                 Count 5, first of all, in footnote 11, page 22, docket

20     31, Count 5 is the preemption or is the state law counts that we

21     contend were preempted.  The plaintiff has conceded -- it

22     happens a lot in Idaho --

23                 THE COURT:  On the first --

24                 MR. ANDERSON:  -- (inaudible) representation is not a

25     claim.  So that -- that count has been conceded.

1          But preemption in our view, it's long been the law

2     that state law claims are preempted within the ambit of ERISA

3     subject to certain exceptions that aren't pled here, for

4     example, laws regulating insurance, banking, or securities.

5          And after that, I'm just going to leave it to the

6     briefing and stand for questions, Your Honor.

7          THE COURT:  I think you have anticipated my -- some of

8     my questions and answered the ones I did have at this point.

9          MR. ANDERSON:  Thank you, Your Honor.

10         THE COURT:  So I'll hear from Mr. Stokes.

11         MR. STOKES:  So as noted I'm going to be addressing

12    the MSPA issues in the case.  And I think there are sort of two

13    main buckets:  First, what does it take substantively to violate

14    the statute; and, second, under what circumstances can a private

15    party sue under the MSPA's private right of action.  And I would

16    like to take those in order, if I could.

17         So starting with what it takes to have a substantive

18    violation, and I'm going to focus in particular on the

19    take-into-account provision.  And, you know, what you just heard

20    from Mr. Anderson, some of it we actually agree with.  He

21    referred to it as the take-into-consideration provision.  And I

22    think that that kind of is where I want to start.

23         So the statute said private health plans may not,

24    quote, take into account that an individual is eligible

25    for -- entitled to or eligible for Medicare based on ESRD.

1    There is only one circuit that -- really only one court, that

2    has really actually grappled with what that means.  What is the

3    plain meaning of the phrase "take into account"?  And that's the

4    Sixth Circuit in *Bio-Medical Applications,* and in that case --

5    this is at 656 F.3d at 282 -- the court says that "take into

6    account" means consider.  So a plan that that provision "take

7    into account," that phrase is not defined anywhere else in the

8    statute, which means that it's governed by plain language, and,

9    you know, taking the plain meaning, it means a plan may not

10   consider its participants ESRD-based Medicare eligibility in

11   determining what benefits to offer them.

12        So I think that that means the question here is

13   whether our complaint gives rise to a plausible inference that

14   in deciding to eliminate its in-network coverage for dialysis

15   and then reduce its reimbursement rates, the defendants -- the

16   question is whether there is a plausible inference that the

17   defendants considered the fact that their ESRD patients are

18   eligible for Medicare, and we think that our complaint gives

19   rise to that inference.

20        And one of the key points that I want to mention is if

21   you look at paragraph 80 of our complaint, WinCo had EthiCare,

22   its contract repricer that they hired, or its contract

23   administrator that it hired specifically for dialysis.  When it

24   enacted these changes, it had EthiCare send a letter to all of

25   its dialysis patients, and that letter said:  Hey, based on what

1    we just did to change the plan, you could face significant

2    financial obligations unless you go enroll in Medicare.  And I

3    think that that's a clear window into what the plan was

4    considering when --

5              THE COURT:  Was that letter sent prior to January of

6    2017?

7              MR. STOKES:  It was sent, I believe, shortly after

8    January 17.  The allegation -- I don't think that we gave the

9    date in our allegation, but it was -- it was at or right around

10   the time of the -- the time that the plan change went into

11   effect.

12             THE COURT:  The allegation regarding the letter is in

13   the complaint?

14             MR. STOKES:  It is.  It's at paragraph 80 in the

15   complaint.  And that's a key allegation here.  Because we think

16   it gives rise to a very strong inference that WinCo would not

17   have enacted these changes if it -- if it didn't know that its

18   ESRD patients had Medicare as a backstop.  And that's how we

19   know that this case -- that's why we think this case truly does

20   implicate the MSPA, and it really is a case of the plan taking

21   into account, i.e., taking into consideration, the Medicare

22   eligibility of its ESRD patients.

23             There are other reasons.

24             THE COURT:  How would -- how would you -- if this

25   claim survives the motion to dismiss, you would move into

1    discovery.  How would you potentially prove or establish that it

2    was taken into consideration?

3         MR. STOKES:  Well, you know, we think that this letter

4    is actually a strong -- will be actually a strong piece of

5    evidence itself of what the plan was considering.  But it's the

6    type of thing where you would go in a deposition and you would

7    ask folks about, well, here is this letter.  Why did you send

8    it?  Or, you know, I don't know exactly what you would say, but

9    that's the type of thing that you would do.  And you would ask

10   for documents that, you know, revealed, what were the factors

11   that motivated this.  And, you know, there is a -- we call them

12   "repricers," these sort of dialysis-specific businesses that

13   come in as contracted administrators specifically for dialysis;

14   because they know that, you know, they enact these sort of

15   carve-outs, because we think they know that they -- that these

16   ESRD patients will have Medicare as a backstop.  So we would

17   probe that relationship and, well, you know, the materials

18   there.  So that's the type of -- those are the types of things

19   we would do in discovery.

20        And you know, we think that it's incredibly likely

21   that it will be revealed, and, frankly, that this letter could

22   in and of itself be strong enough evidence to establish our

23   claim along with proving up other things alleged in the

24   complaint.

25        So that is kind of the key substantive point that I

1     want to drive home about the take-into-account violation and why

2     we think there is a plausible inference that certainly gets past

3     the motion to dismiss stage.

4          And I want to turn now to sort of something that

5     Your Honor seems to have on your mind, which is this issue of

6     whether Medicare needs to be out of pocket in order for us to

7     have a claim.  And there that's the question, whether does

8     Medicare have to make a payment before a private party can sue

9     under act.  And, you know, whereas we think that *Bio-Medical*

10    *Applications* announced the correct standard for what it means

11    substantively to violate the take-into-account provision.  We

12    think that this went astray in saying, but you can only access

13    the private right of action if Medicare has made a payment.

14         And I actually think that it's -- it's an under- -- I

15    mean, we would call it an understandable mistake, because there

16    was no question in that case that Medicare actually did make

17    payments.  So the Sixth Circuit wasn't actually considering, it

18    didn't have occasion to -- we pulled the briefing.  We looked at

19    it.  No one is arguing about whether -- no one is making the

20    arguments of the sorts that we are making here.  And so it's

21    perfectly understandable and kind of illustrates maybe why

22    courts shouldn't go out and address things that they don't need

23    to in order to reach decisions.  Because we think that when you

24    actually -- when one actually kind of grapples with what the

25    statute says, there is no good reason to think that Medicare has

1    to have made a payment before a private party can sue under the

2    act.

3              And so a few points there, first.

4              The statutes substantive provisions, the

5    take-into-account provision, they expressly cover people who are

6    not enrolled in Medicare.  So it says that plans cannot take

7    into account that an individual is, quote, entitled to or

8    eligible for Medicare.  And if you can only sue when Medicare

9    has made a payment, well, Medicare is never going to make a

10   payment for people who are only eligible but who are not

11   enrolled in Medicare.

12             And so it would be a really odd statute for Congress

13   to have written to say:  Hey, we're going to protect both of you

14   equally, those who are enrolled and those are eligible.  But,

15   you know, we are only going to allow one group of you to sue.

16   It just would be a strange way to read the statute.  It doesn't

17   make sense, all of the provisions together.

18             The second core point is that the statute provides a

19   separate, government-only cause of action, which expressly -- it

20   has language expressly requiring a payment by Medicare before

21   the government may sue.  That language that says the government

22   can only sue when Medicare has made a payment, that language is

23   absent from the private right of action.  So you have two

24   different causes of action, very close to each other in the

25   statute.  You have one of them that expressly says the

1    government can only sue when -- in order to recover a payment

2    made under the subchapter.  The other one doesn't have that

3    language.  It just says there is a private cause of action for

4    damages in the case of a primary plan that fails to provide a

5    primary payment as required.  So that's a crucial difference.

6    And it's sort of a -- we hit the basic statutory interpretation

7    point where you have the language saying Medicare has to pay in

8    one cause of action but not in the other, you should give effect

9    to that difference.

10           And that kind of leads to sort of common sense and

11   serving the purposes of the act.  So we're talking about a

12   private right of action, and every circuit that has looked at

13   the question has said that you cannot proceed under the private

14   right of action based on anything but your own private injury.

15   This comes up in the context of people who were trying to bring

16   qui tam lawsuits under the private right of action.  Courts

17   uniformly in every circuit that has addressed it have said, no,

18   the private right of action exists to remedy private harm, not

19   harm to the government, so you can't sue based on injury to the

20   government.

21           So we think it would be very strange to then -- we

22   think that that means that the key to the inquiry should be, is

23   there private harm that violates the statute, not harm to the

24   government.  That -- the government's action, the government's

25   decision of whether or not to make a payment is completely

1       optional.  The statute says if a private plan hasn't paid as

2       required, the secretary may but does not have to make a

3       payment -- a conditional payment.  And so, again, we think it

4       would be a very odd way to -- it would be very odd to say that a

5       private party can only vindicate her rights under the statute to

6       remedy her own violation if the government takes some sort of

7       voluntary action.

8              And that leads right into kind of, I guess, a purpose

9       argument, which is that if the idea is that Congress wants

10      private parties to be filing lawsuits in order ultimately to

11      prevent the government from having to bear the cost of treating

12      these people, why does it make sense to say that you can only do

13      that when the government has already had to pay out?  And so you

14      can have an example, an extreme example where the plan says:  As

15      soon as you become eligible for Medicare because of ESRD, I cut

16      you off.  You are no longer part of the plan.

17             Well, for a person who is not enrolled in Medicare

18      already, for a person who is only eligible, for that person to

19      bring a lawsuit, they then have to go and actually enroll in

20      Medicare, have Medicare become the primary payer, incur injury,

21      and only then can they sue the plan to get kind of reinstated.

22      But that doesn't make sense when you think about what the

23      private right of action is supposed to be doing.

24             So, again, we think that there are -- that it's really

25      the only plausible way to actually read the statute and make

1    sense of its provisions together, and that it accords with

2    common sense and the purpose of the act to read it our way, and

3    that's why we think that we can proceed under the private right

4    of action.

5           Now, I'll note my colleague, Mr. Donofrio is going to

6    address the ERISA assignment issues; but to the extent we have a

7    valid assignment under ERISA, I want to make clear that there is

8    a second route to pursue the substantive claim, which is the

9    idea that -- again, this is in *Bio-Medical Application* --

10          THE COURT:  That was going to be my question.  Do you

11   have to have a valid assignment for DaVita to pursue the cause

12   of action under the MSPA?

13          MR. STOKES:  Not -- no, not for DaVita to pursue the

14   cause of action in its own right.  They don't challenge that.

15          THE COURT:  Right, okay.

16          MR. STOKES:  And there is case law from other circuits

17   that actually says that expressly.  There is case out of Sixth

18   Circuit called *Michigan Spine*.

19          THE COURT:  So can you explain to me what it is that

20   the injury is to DaVita?

21          MR. STOKES:  Yes.  The injury to DaVita is that it

22   should have been paid more and that it would have been paid more

23   had its -- had folks not been made to go out of network.

24          THE COURT:  It should have been paid more than its

25   usual and customary rate or?

35

1          MR. STOKES:  So before the elimination of network

2     coverage, DaVita was paid at higher in-network rates for

3     these -- for its patients.

4          THE COURT:  Was the higher in-network rate higher than

5     the usual and customary?

6          MR. STOKES:  I -- yes.

7          THE COURT:  You know, because I --

8          MR. STOKES:  Yes, I believe so, Your Honor.

9          THE COURT:  There are three different rates.

10         MR. STOKES:  Yes.  Yes, Your Honor.  I believe -- yes.

11         THE COURT:  There is in-network, out-of-network, and

12    usual and customary.

13         MR. STOKES:  That's -- well, so out of network is

14    supposed to be usual and customary, and that's one of the issues

15    that Mr. Donofrio will address.  One of our core ERISA ideas is

16    that -- the kind of core is that the plan promises UCR for out

17    of network, but what we are getting is not actually a true UCR

18    as that is defined by the plan.  So but that's separate from the

19    contracted in-network rate that we received before the plan

20    change that we allege, plausibly we think, violates the MSPA.

21         So that's the injury to DaVita is that DaVita would

22    be -- would be paid more money if -- but for the violation of

23    the MSPA.  It's a straightforward, economic injury.  You know,

24    there is, whatever, a plethora of authority that says that

25    that's enough to satisfy the elements of standing.

1          THE COURT:  Why -- and this isn't -- this is probably

2     a little bit outside the briefing, probably because I couldn't

3     find the answer to this question; but why wasn't DaVita a

4     provider for this other company?  For EthiCare?  Is that in the

5     record somewhere or --

6          MR. STOKES:  That is not in the record.

7          THE COURT:  Okay.

8          MR. STOKES:  Well, so, we alleged in our complaint

9     that DaVita is not in this so-called EthiCare network.  We

10    alleged that clearly in the complaint.  That's true.

11         THE COURT:  Okay.  So --

12         MR. STOKES:  DaVita is also unaware of any provider

13    that is part of the network.  The allegation is that the plan

14    says there will be this EthiCare network, but that -- that

15    network in actuality is nonexistent.

16         THE COURT:  And that's pled in the complaint?

17         MR. STOKES:  That is pled in the complaint, and I can

18    give you the allegations.  Sorry.  Bear with me for just one --

19         So it's basically, starting at paragraph 40 in the

20    complaint, it sort of sets out with specificity each of the

21    steps.

22         THE COURT:  Okay.  That's -- that's fine.  I'll look

23    back at that section.  Thank you.

24         MR. STOKES:  Okay, yeah.

25         Okay.  So I see I have used a little over half of our

1      time so I just --

2                THE COURT:  You're going to have to deal with that

3      with Mr. Donofrio.

4                MR. STOKES:  Of course.

5                So, Your Honor, I just want to address one final point

6      briefly, which is, you know, they talk about this idea that it's

7      a uniform limitation on -- on services.  And I want -- I want to

8      just say -- make very clear that that goes to the

9      differentiation aspect of the case, not the taking into account.

10     There are two separate provisions that cover different ground.

11               Differentiation deals with whether sort of comparative

12     treatment as between ESRD and nonESRD people.  And that is

13     different from taking into account or taking into consideration,

14     as Mr. Anderson put it.  And the idea -- the -- we would urge

15     you, Your Honor, not to collapse the two violations into one,

16     because they have to cover different ground or Congress wouldn't

17     have enacted both of them.  And that different ground that's

18     covered by the take-into-account provision is -- we think that's

19     eliminated by the Sixth Circuit decision that explains take into

20     account means consider.  What did the claim consider when it

21     enacted its limitations?  And that's where this point about, oh,

22     they sent this letter saying:  Hey, we changed the plan.  Now

23     you better go enroll in Medicare to avoid these problems.

24               So I just wanted to make that final point.

25               And with that, unless Your Honor has further

1      questions, I would turn it over to my colleague.

2                  THE COURT:  Okay.

3                  Mr. Donofrio.

4                  MR. DONOFRIO:  Thank you, Your Honor.  Mike Donofrio,

5      also from Stris & Maher.

6                  THE COURT:  Oh, and I have been pronouncing your name

7      wrong.  I'm sorry.

8                  MR. DONOFRIO:  I didn't hear, so no harm, no foul.

9                  THE COURT:  Donofrio.  Okay.

10                 MR. DONOFRIO:  And I have answered to many other

11     things and pronunciations over the year.

12                 THE COURT:  I imagine that.

13                 MR. DONOFRIO:  It's not a problem, Your Honor.

14                 I want to touch -- touch briefly with the time

15     remaining on the Count 3, the ERISA claim for benefits, and I

16     would like to start there, because I think there is a

17     fundamental disconnect between some aspects of Mr. Anderson's

18     argument and what's actually alleged in the complaint.  When

19     Mr. Anderson was addressing Count 3, he -- he drew a tight

20     analogy to Judge Tigar's decision in *Amy's*.

21                 I really want to highlight for Your Honor --

22     Mr. Stokes touched on this at the end of his presentation --

23     beginning at about paragraph 33 of the complaint and heading

24     into the 40s, what the complaint sets out very clearly is a

25     pretty simple idea that sits at the core of all of our ERISA

1     claims, which is that the plan made some promises and that as of

2     January 1, 2017, the defendants delivered something other and

3     less than those promises.

4          So, for example, Your Honor, the plan -- and we allege

5     this -- this allegation appears at paragraph 33 of the

6     complaint, and we're really just looking at the plan itself so

7     this comes from section 9.7 of the plan which appears at page 22

8     of that exhibit.  The plan defines two benefit levels of

9     coverage, in-network coverage and out-of-network coverage, and

10    that's what it tells its members.  And that's a critical

11    benefit.  In-network coverage, as the plan also informs its

12    members, protects its members from balance billing for example.

13    In order to be in-network, a provider has to agree to accept as

14    payment in full the amount allowed by the plan.  So that's a

15    very important benefit and protection that plan members receive

16    through in-network coverage.

17         The second aspect of the promise -- and this is also

18    clearly alleged in the complaint and, frankly, indisputable,

19    because, again, it comes directly from the plan.  The plan

20    specifies the level at which reimbursement will be made for

21    those two types of coverage.  So for in-network, it says that

22    reimbursement will occur at the contracted rate, and for out of

23    network, it says it will occur at UCR, the usual and customary

24    rates as defined in the plan.  And then the plan at page 1 of 6

25    defines UCR.  And it defines UCR as follows:  The amount paid

1    for a service in a geographic area based on what providers in

2    the area charge for the same or similar medical services.

3              So there are many ways to define UCR.  If Your Honor

4    were to peruse a number of plans, you would see many different

5    definitions with different reference points.  The reference

6    point that the defendants chose here is amounts paid in a

7    geographic area based on what providers charge.  So charge is

8    really the key there.  Again, if you were to peruse plans, you

9    would see UCR rates defined even sometimes with reference to

10   Medicare, but this plan didn't do that.

11             So that's the promise.  It's a two-part promise.  Two

12   types of coverage, in-network and out-of-network, with their

13   associated reimbursement methods.

14             And then -- and then we allege very clearly what

15   actually happened, and what actually happened when the switch to

16   EthiCare occurred, is that the benefits that were actually given

17   to plan members were less than what was called for in the plan;

18   and that's a critical distinction between the reasoning that

19   Judge Tigar employed in *Amy's* and the allegations here, in terms

20   of alleging an injury in fact and, frankly, a plausible -- to

21   plausibly state a claim for benefits.

22             And I want to just put a little bit of point on the

23   aspects of the promise that were not delivered and what we

24   allege.

25             So as Mr. Stokes touched on this a bit, we have

1    clearly alleged that DaVita is not a part of any EthiCare

2    network for dialysis care.  We have also alleged that on

3    information and belief, which is all we can go on at this

4    pleadings stage, no provider that we're aware of is.  So -- so

5    in effect, the plan says that there is an in-network option for

6    dialysis, but -- but at the point in time when they shifted from

7    EthiCare -- from Blue Cross to EthiCare, that -- that option

8    actually disappeared as a practical matter for plan

9    beneficiaries, depriving them of the important benefits that

10   flow from in-network coverage.  So that's -- that's one way in

11   which they received less than what the plan tells a reasonable

12   reader that they would receive.

13           And then -- and then the second piece occurs in

14   the -- in the reimbursement realm.  We're only talking as a

15   practical matter now about out-of-network reimbursement, because

16   in-network doesn't exist as we have alleged.

17           We have also alleged that, in fact, the actual

18   reimbursements that began to occur after the switch to EthiCare

19   were less than the UCR rates that DaVita would typically receive

20   per the plan's definition.  And instead, the rates dropped to a

21   relatively small multiple of Medicare.  So from a standard UCR

22   based on provider charges in the geographic area to a

23   Medicare-based rate.  So that's another way in which the -- the

24   reality did not match up to the promise that was made in the

25   plan.  And that's all alleged -- that's all alleged in our

```
1     complaint beginning, like I said, around the mid 30s.

2           THE COURT:  So are you alleging that the WinCo plan

3     promised in-network providers for dialysis or in-network

4     providers for all treatments?

5           MR. DONOFRIO:  Both, Your Honor.  It -- across the

6     board, the plan provides that -- the two options.  And, in fact,

7     even more specifically, if -- if you look at the benefits

8     schedule in the plan, that's at page 25 of the exhibit.  It's

9     sort of a grid.  And the columns in the grid are in-network,

10    out-of-network.  So for the kidney dialysis entry, you will see

11    that there are entries very similar to those that you will see

12    for other service categories throughout the benefits schedule,

13    indicating that, you know, there is an in-network coverage

14    benefit and an out-of-network coverage benefit.

15          And the plan also highlights for its members,

16    Your Honor, the distinction between in-network and

17    out-of-network.  The plan in so many words tells members, you

18    know, in-network coverage means the provider has agreed to

19    accept the allowed amount as payment in full.  So -- so the plan

20    is quite clear in terms of the benefits that should be

21    delivered, but the reality after the switch to EthiCare did not

22    match up to that.  And that -- that's a quintessential ERISA

23    benefits claim.  It's also -- in many ways, it's what lies at

24    the core of -- of the MSPA claim as well.

25          THE COURT:  So do all three of your ERISA claims rest
```

1      on the validity of the assignment or the scope of the

2      assignment?

3              MR. DONOFRIO:  So -- so I have to take those on two

4      separate tracks.  It gets a little -- it gets a little crazy

5      when we move into the assignment realm.  So --

6              THE COURT:  Two and 4 do; correct?  Counts 2 and 4

7      rest on the assignment?

8              MR. DONOFRIO:  Counts 2 and 4 rest -- so our position

9      is that Counts 2 and 4 rest on your view of the scope of the

10     assignment.  The -- I don't think there is any dispute that the

11     assignment as described in the complaint carries with it a

12     benefits claim.  The question is whether the assignment as

13     described and alleged in the complaint also carries with it the

14     claims for equitable relief, and we contend that it does.

15              We respectfully disagree with Judge Tigar's reasoning

16     in that regard.  We -- Judge Tigar lays out a spectrum of, you

17     know, different types of assignment language that occur in these

18     assignment documents.  And at one end, you know, at the easy

19     end, is a case like *DB Healthcare*, where the assignment clearly

20     states just the rights and benefits under this plan.  And then

21     at the other end of the spectrum is the CareFirst --

22              THE COURT:  CareFirst.

23              MR. DONOFRIO:  Yeah, where it actually lists the

24     statutory sections.

25              And I -- so I think our -- the provision at issue here

44

1    falls somewhere in the middle, and Judge Tigar sort of tied it

2    to the *Spindedex* decision and to the language in *Spindedex*.  And

3    the language in *Spindedex* -- the *Spindedex* assignment language

4    didn't include any reference to a cause of action, a legal

5    claim, language like that.  But as Judge Tigar observed, the

6    assignment here says, includes the actual words "any cause of

7    action" along with the words "payment of benefits."

8            So we think the best interpretation of that language

9    is in order to give that any cause of action language meaning,

10   it can't be subsumed into the payment of benefits language, and

11   the answer can't be that all that is conveyed by that assignment

12   are -- is that which sort of travels with the benefits claim.

13   It has to be something more.  And very broad language, any cause

14   of action, particularly when read through the viewpoint of a

15   reasonable plan beneficiary, who after all the assignor is a

16   patient, a beneficiary under the plan -- a reasonable plan

17   beneficiary would read that language to mean what it says, any

18   cause of action without qualification.  It's -- it -- a

19   reasonable plan beneficiary is very unlikely to kind of parse

20   through different -- you know, an ERISA benefits claim versus an

21   ERISA claim for equitable relief versus some other type of

22   claim; but rather read that language and think:  What I am doing

23   is I am giving my provider the tools they need to make sure

24   that -- that my care is paid for because ultimately that's what

25   I want.  I want to receive my care, and in order to receive my

1    care, I want my care to be paid for.

2         And then to sort of complete the intent of the

3    parties' analysis, the other party to the assignment is the

4    assignee; and there again, the intent is to receive the maximum

5    sort of the broadest array of tools possible to accomplish

6    that -- that goal of providing care and being -- and being

7    fairly compensated for it.

8         So -- so we think that any cause of action language

9    that appears in the DaVita assignments is a critical

10   distinction, particularly when through the lens of the two

11   parties to that document.  And -- and that's -- that's where we

12   diverge from Judge Tigar's reading and his placement of this

13   assignment, you know, closer to that *DB Healthcare* end of the

14   spectrum.

15        So -- and then where that gets us is, that means that

16   the benefits claim and the two claims for equitable relief

17   traveled from the patient to DaVita and DaVita has standing to

18   bring those claims.

19        Now, the -- it took me awhile to go down that track.

20        The other track that Your Honor originally asked about

21   was essentially the nonassignability clause and what

22   impact -- what impact that has on these claims.  The language

23   that we were looking at before is very specifically -- it's

24   limited in what -- in the types of assignments that it seeks to

25   prohibit.  It says "the right of any participant to receive any

1    reimbursement under the plan." So it's not any right under the

2    plan. It's not any cause of action under the plan. It's a

3    provision designed to limit someone's ability to assign the

4    right to receive reimbursement under the plan. So something

5    closer to the right to receive benefits or payments under the

6    plan.

7         So -- so we think the most reasonable reading of that

8    language is whatever -- wherever Your Honor comes out on

9    the -- on the question of the operation of this language as that

10   filters through the *Davidowitz* and *Herman* cases, this language

11   is so -- is limited in a way that cannot be applied to the

12   claims for equitable relief so they sit outside the

13   nonassignability provision.

14        So if the equitable claims, Counts 2 and 4, fit within

15   the scope of the assignment, they are not barred by the -- by

16   this provision because of that limiting language, the right to

17   receive any reimbursement under the plan. But we need to

18   address this provision on its merits anyway, Your Honor, because

19   that language pretty clearly does apply to the benefits claim.

20        We not surprisingly diverge from Mr. Anderson's

21   reading of the case law in terms of the ambiguity of this

22   provision as applied to healthcare providers.

23        So the -- the *Davidowitz* and *Spindedex* cases do stand

24   for the proposition that I believe Mr. Anderson said they stand

25   for. They stand for the proposition that as a blanket matter

1  nonassignability provisions in ERISA plans are valid.  And the

2  history of the *Davidowitz* case sheds a little bit of light on

3  what that means and how far it goes.

4      *Davidowitz* was decided at a time when there was

5  some -- there was a lack of clarity in the law about what types

6  of ERISA claims could be assigned.  ERISA by its terms bars

7  assignment of pension benefits but does not bar assignment of

8  other types of benefits.  And so other types of -- of providers

9  and beneficiaries were making arguments along the lines of the

10  absence of that prohibition means that with medical benefits,

11  for example, you can never bar their assignment.  ERISA's

12  silence means that assignment is always required.

13      And *Davidowitz* was answering that kind of threshold

14  question saying:  No, we're going to -- just because ERISA, you

15  know, bans assignments for one thing and not others, we are

16  still going to look at plans essentially the way that we look at

17  contracts, and if there is antiassignment language in a plan

18  that's valid, unambiguous, we'll honor it.

19      *Davidowitz* and *Spindedex*, though, don't directly

20  answer the question how do you read any particular provision.

21      And the reason we point to the *Herman* case is because

22  it talks very specifically about how you read a provision just

23  like this one.  The words -- the actual words are different, and

24  the -- we quoted the provision in our brief at page 17, but

25  it's -- it's purely semantic differences, Your Honor.  The first

1      portion of the *Herman* nonassignability provision is just like

2      this one.  It says, you know, no person -- I'm going to

3      paraphrase.  There is a lot of words.  It says:  No person -- no

4      person under the plan shall have the right to -- and then it's

5      the list of verbs beginning with "assign" -- any benefit payment

6      hereunder.  So that's very similar to the initial clause of the

7      WinCo provision.  Then there is a comma and an "and," identical

8      to the -- to the grammar that Mr. Anderson parsed for Your Honor

9      earlier when he was focusing on the WinCo language.

10             And the language that follows is functionally

11     equivalent to the next clause in the WinCo line.  It's -- it's:

12     Any such payment shall not be subject to any legal process to

13     levy execution upon or attachment or garnishment.  Essentially,

14     it's the creditor piece.

15             And what the Fifth Circuit in *Herman* said was in

16     interpreting this clause in the face of a provider assignment,

17     it's ambiguous, because it's -- it points -- it points directly

18     at creditors.  It's -- its import is to recognize that general

19     creditors don't have a sufficient connection to the delivery of

20     the plan's benefits as a provider does.  And so -- so it only

21     unambiguously bars assignments to general creditors, and

22     providers are accepted.  And that sort of reaches back to the

23     Ninth Circuit decision in the *Misic* case that we have cited in

24     our brief, that recognized that the provider, even though not a

25     direct beneficiary under the plan, the provider is integral

1      to -- to the plan achieving its outcome of providing medical

2      benefits to its members.  And that's why we think *Herman*'s

3      reading makes a lot of sense here and puts providers in a

4      different status than -- than other types of creditors or other

5      types of parties to whom these benefits might be assigned.

6              So -- so what that boils down to is this language is

7      not unambiguous in barring assignment to DaVita, and therefore

8      it doesn't -- at least at the pleadings stage, it can't be -- it

9      can't be used to defeat our claims as a matter of standing.

10             Now, our final argument on that point, Your Honor, is

11     that even if you disagree with us and conclude that the

12     antiassignment provision does unambiguously bar assignment to

13     providers, WinCo has waived its ability to raise it.  And I

14     don't want to belabor that point too much, because you went over

15     it in some detail with Mr. Anderson.

16             But what I want to -- I want to highlight, No. 1,

17     the -- the backdrop for our -- for our contention here is a long

18     course of dealing comprising many, many transactions and many,

19     many interactions between DaVita and the plan and the plan's

20     administrator in which it was made abundantly clear over and

21     over again that DaVita believed it had a valid assignment of the

22     patient's -- of the patient's rights under the plan.  And we

23     concede --

24             THE COURT:  To receive the benefits?

25             MR. DONOFRIO:  Yes.  And we concede that the -- or we

1          recognize that the case law is mixed in terms of what that set

2          of facts means.  We have cited some cases from other

3          jurisdictions that say that -- that is a waiver.  There are

4          cases from jurisdictions closer to us that go the other way,

5          but -- but there is a plus factor here which is -- which is the

6          allegation at paragraph 60J that in correspondence directly to

7          DaVita, EthiCare told DaVita, in essence, if you're unsatisfied

8          with this outcome, you can sue under ERISA.

9                    That is the type of clear statement of the intent to

10         relinquish the right that CareFirst talks about and puts this

11         case in a different category from the -- from that kind of the

12         mix of cases that look at the ordinary course of dealing.  And

13         that means that WinCo can't use -- can't invoke this provision

14         to get around any of the ERISA claims.

15                   Your Honor, I don't -- I don't know where I am on

16         time.  I fear that I have probably run over.

17                   THE COURT:  You have five minutes left.

18                   MR. DONOFRIO:  Oh, okay.

19                   THE COURT:  You can give some of it back to

20         Mr. Stokes.

21                   MR. DONOFRIO:  I was just going to say that if

22         Your Honor doesn't have a question for me right now, if I could

23         have three seconds to consult with Mr. Stokes.

24                   THE COURT:  Sure.

25                   MR. DONOFRIO:  And Mr. Kelly and Mr. Gustavsen.

1      Thanks.

2           (Pause.)

3           Again, Your Honor, unless you have any additional questions

4      for us, we have nothing further at this point.

5                THE COURT:  Okay.  Thank you.

6                MR. DONOFRIO:  Thank you very much.

7                THE COURT:  Mr. Anderson.

8                MR. ANDERSON:  Thank you, Your Honor.

9                Your Honor, I don't intend to use all the time that I

10     may have, but is it possible to get a sense of how much time I

11     have, just --

12               THE COURT:  Twelve minutes.

13               MR. ANDERSON:  Oh.  We'll be -- it won't take that

14     long.

15               Your Honor, a couple things.  I'll start with

16     where -- where counsel ended.  There was this argument about a

17     plus factor being that you would -- there was an advisement of a

18     right to sue.  That's required by law.  How could that ever be a

19     plus factor?  It's required every time.

20               But going kind of back in chronological order, I made

21     some notes of some points that I would like to make.  And point

22     No. 1 goes all the way back to the Sixth Circuit *Bio-Med of*

23     *Tennessee* case that we have gone back and forth.  And there was

24     kind of the suggestion that somehow pieces of the significance

25     of Medicare making a payment were overlooked, or not part of the

1    case or -- I don't know exactly what I heard, but what I read

2    starts at page 285 and ends through 287, and that was key to the

3    court's analysis on how do you -- how do you treat a private

4    cause of action when you have a differentiation allegation and

5    do you need Medicare making a payment.  And the court went

6    through -- and it starts at page 286 and spills over into 287 --

7    and that's where the court says:  A primary plan is liable under

8    the private cause of action when it discriminates against plan

9    holders on the basis of their Medicare and eligibility and

10   therefore causes Medicare to step in and temporarily foot the

11   bill.

12        And here is the rest it that's not quoted in the

13   brief:  Our interpretation in addition to rendering operative

14   all relevant statutory provisions is imminently reasonable.  It

15   permits lawsuits against the primary plans that perform the

16   precise actions the act condemns, which is to make Medicare be

17   something other than secondary and make a payment.

18        So that's the first point on the Sixth Circuit case.

19        There was a whole lot of discussion, Your Honor, about

20   this in-network/out-of-network discussion.  We called it a red

21   herring in our brief.  We continue to believe it's a red

22   herring, and I just want to put it on the screen for Your Honor.

23   There was -- there was some reference made to the plan itself,

24   page 33.  This is the section dealing with benefits provided,

25   and I guess what I would like to focus on is when you read it,

1    it lays out a clear path, which is there is either an in-network

2    rate based on agreement or there is an out-of-network rate based

3    on the UCR reimbursement as defined by the plan, not as defined

4    by DaVita or the plaintiffs.  It's as defined by what's in the

5    plan.

6          And I heard a lot about the allegations that are

7    in -- somewhere starting in paragraphs 35.  I have studied this

8    complaint more than I care to admit, and I guess we're just at

9    loggerheads in terms of what really is alleged, because the

10   in-network/out-of-network distinction in our view is just not a

11   distinction.

12         And to that further point, not only is it not a

13   distinction as it relates to ERISA, it's not a distinction as it

14   relates to the MSPA.  We have a case, the *National Renal*

15   *Alliance* case, which is right on point as it relates to this

16   in-network/out-of-network argument.  There was essentially the

17   same argument made, and the court in that case, District Court

18   in Georgia granted -- U.S. District Court granted the motion to

19   dismiss, basically saying this is a dispute between two private

20   parties over rates of reimbursement that does not impact

21   Medicare.

22         And the court quoted here:  Plaintiffs proposed theory

23   of damages the difference between the cost of services and the

24   rate of payment set by provider.  This calculation, however, has

25   no impact on Medicare, the damages provided for in the statute

1    simply do not fit the situation here.

2              And that's exactly what we're saying here, Your Honor,

3    that this -- that court was talking specifically in the context

4    of whether in-network or out-of-network made any difference at

5    all.

6              And then, finally, Your Honor, just one final point

7    on -- there was an argument about the scope of the assignment.

8    I don't want to belabor the assignment, but there was this

9    argument that Counts 2 and 4 are safe because they seek a

10   different relief, and that's true as far as it goes.  That is

11   true.

12             But when you take a step back and look at the type of

13   relief, Count 2 seeks an injunction stopping payment and

14   requiring payment at a higher rate.  Count 4 seeks an estoppel

15   to prevent WinCo from paying at a lower rate.  It's all the same

16   thing about -- talking about the rate of reimbursement for

17   payment.  So to say it's a different theory under law, I agree

18   with.  But the point here is it's an end run to get to a payment

19   of benefits which I think I heard the language supports in the

20   antiassignment clause, absolutely, there is no assignment.  I

21   know we disagree on the scope, but the court has to give meaning

22   to those words.

23             And with that, I'll conclude my comments.  Thank you.

24             THE COURT:  Okay.  Great.  Well, the motion is under

25   advisement, and I have some more reading to do.  I'll get a

1    decision out in due course.

2              But is there anything additional we should take up

3    this afternoon.  For the plaintiffs, Mr. Stokes?

4              MR. STOKES:  Not that I'm aware of, Your Honor.

5              THE COURT:  Mr. Anderson, for the defendant?

6              MR. ANDERSON:  Not for us, Your Honor.

7              THE COURT:  I appreciated counsel's arguments and

8    you're well prepared, and the fact that you stayed under the

9    45 minutes is impressive, even with the court's questions.

10   So -- and it looks like Mr. Kelly can make his plane and doesn't

11   have to just run out of here.

12             So with that, court is in recess.

13         (Proceedings concluded at 2:32 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF TRANSCRIPTION

2

3

4

5

6          I, Tamara Hohenleitner, do hereby certify that the

7     foregoing was transcribed by me and is a true and correct

8     transcript of the electronically recorded proceedings held in

9     the above-entitled matter.

10

11               Dated this 31st day of May, 2019.

12

13

14               /S/ TAMARA I. HOHENLEITNER
                 _____
15               TAMARA I. HOHENLEITNER

16

17

18

19

20

21

22

23

24

25